## ALLEN B. LOCKHART *vs.* STATE OF MARYLAND.

---

## R. TYNES SMITH, JR., *vs.* STATE OF MARYLAND.

*Conspiracy to Defraud—Stock Brokerage Firm—Indictment—*
*Change of Venue—Selection of Jury—Challenges—*
*Evidence—Cross-Examination.*

The sufficiency of the indictment must be considered without regard to whether the trial is by the court or a jury.　　　· p. 612.

On the prosecution of members of a firm of stock and bond brokers, for conspiracy to defraud its customers, each count of the indictment charging that the defendants' firm was insolvent, and that, well knowing this fact, defendants conspired to defraud its customers by certain false pretenses, any definition of insolvency in the indictment, whether erroneous or not, was surplusage, the allegation as to the financial condition of the defendants being material because of its relation to the other averments of the indictment, and it being with reference to the defendants' alleged knowledge of the insufficiency of the firm's assets to pay its liabilities, and not with a view to any particular standard of insolvency, that the charges of conspiracy to deceive their customers was preferred.　　　　p. 612

That members of a firm of stockbrokers had recently been tried and convicted on a charge of conspiracy to defraud customers of the firm did not show that the refusal of the same

court, on a subsequent prosecution of members of another firm of stockbrokers for a like offense, to grant a change of venue, involved an abuse of discretion.    pp. 612, 613

Before exercising the right, given by Code, art. 51, secs. 13, 17, of striking four from a list of twenty jurors drawn from the whole panel, the State and the defendants were entitled to have a preliminary examination for the purpose of securing a list of twenty jurors free of any bias or prejudgment, and as to whom no other ground of disqualification existed.    p. 613

A talesman having been told that the presumption of innocence is in favor of one charged with a crime, and having, in answer to the question whether he could give to the traversers the benefit of a reasonable doubt and determine from all the evidence whether they were innocent or guilty, replied that he would give them the benefit of a reasonable doubt and "a fair and square trial," it was proper to refuse to permit him to be asked whether he would expect them to prove that they were innocent, and to rule that the talesman was qualified.
pp. 614, 615

On the prosecution of the members of a firm of stockbrokers, that a talesman said, in regard to stockbrokers generally, that "he let them alone," had "no use for them," and did not "believe in" the business, *held* not to show that he had any prejudice against stockbrokers as a class that would affect his ability or disposition to consider the evidence fairly and to reach a just conclusion, he having also assured the court that he had not formed or expressed any opinion as to the guilt or innocence of the accused, and that he would render a proper verdict according to the evidence.    p. 615

A prejudice against the particular business in which defendant was engaged, and not against defendant, is not ground for disqualification of a juror.    p. 615

That, on a prosecution of members of a firm of stockbrokers for conspiracy to defraud its customers, a talesman was found to be an office manager for one of the firm's creditors, who had lost by the firm's failure, was sufficient ground of disqualification.    pp. 616, 617

It was error to reject a definite proffer by defendants of the testimony of four witnesses to prove that a talesman had expressed an opinion unfavorable to defendants, and had stated

a desire to be a member of the jury by which they were to be tried, the testimony of the talesman himself as to his freedom from prejudice being insufficient to control the court's judgment in this regard, and the making of such a statement by him, if proved, being conclusive of his incompetency.

pp. 616-618

That a valid challenge by defendants of a talesman for cause was rejected, and that it was consequently necessary for them to employ a peremptory challenge in order to dismiss the objectionable talesman, is not cause for reversal, if, in pursuance of an extra-statutory procedure followed by the court, in which defendants acquiesced, they, as well as the State, were given the benefit of peremptory challenges beyond the number named in the statute, independently of that utilized for the exclusion of the talesman in question.                pp. 619, 620

The exercise by the State of the privilege, accorded to both it and defendants, of making use of peremptory challenges in excess of those authorized by the statute, did not involve an impairment of defendants' right to be tried by a duly qualified jury.                                         p. 619

Defendants having assented to the deviation from the statutory policy as to the allowance of peremptory challenges, and this having resulted in the enlargement of their challenge rights, they could not reasonably complain of the irregular method by which that result was accomplished.        · p. 620

If the legal right of the defendants to the use of peremptory challenges had been actually reduced by any of the trial court's rulings in connection with a challenge for cause, the Court of Appeals would not require affirmative proof of resulting injury as a condition of reversal, but when it appears that in consequence of an extraordinary procedure, conducted with their assent, the defendants had the use of peremptory challenges beyond the legal limitation, apart from the one expended for the exclusion of the talesman who should have been excused for cause, and when for that reason no restrictive effect upon their legal rights can be attributed to the erroneous ruling, the fact that the record does not suggest any reason to doubt the competency or impartiality of any member of the trial jury as finally impanelled is a material consideration supporting the view that the error is not reversible.                p. 620

Papers and records of defendants, received from them, and produced at the trial, by the receivers appointed in their bankruptcy proceedings, were admissible against them.     p. 621

On the prosecution of members of a firm of stockbrokers for conspiracy to defraud its customers, it was not prejudicial error to refuse to strike out the statement of a witness, an accountant employed by the receivers of the firm, that certain securities which defendants sold were "supposed to be held in trust for customers," the uncontradicted evidence proving the existence of a virtual trust of stocks and bonds for which the customers were making payments, it having been understood that the securities could be pledged, but assurances having been given that the firm would not sell them without notice to customers, and that it was able to protect the investments.

pp. 621, 622

On the prosecution of members of a firm of stockbrokers for conspiracy to defraud its customers, the fact that, on cross-examination, an accountant testified that forced sales of securities were made by defendants because they did not have sufficient capital to carry on their business and that the average broker had enough capital to prevent such occurrences, did not justify a cross-interrogatory, addressed to him, as to the average amount of capital employed in the brokerage business in that city, this not reflecting upon the question whether defendants had sufficient capital in view of the requirements of their particular business.     p. 622

Evidence that national and state banking institutions were not required to conform to changing market conditions in the appraisement of their securities for the purposes of their financial reports, offered in support of defendants' contention that they should not be considered insolvent merely because their assets may have become insufficient to meet their liabilities as the result of a temporary decline of market values, was properly excluded, since the admissibility of such evidence could be considered only with reference to the specific conditions existing in the defendants' own business, evidence on which subject was freely admitted, and evidence as to the privileges granted banking institutions in regard to 'the appraisal of their securities would not have tended to prove the defendants' ability to discharge their obligations.     p. 623

Evidence that the receivers for defendants' firm sent out statements to its customers crediting the customers with securities purchased by them, without mentioning subsequent sales thereof, was not admissible to justify the sending out of similar statements by the firm while its business was in active operation, these latter being designed to promote the continuance of the business, while the object of the former was merely to inform those who had dealt with the firm as to the condition of their accounts appearing on its records.　　　pp. 623, 624

Evidence that defendants had insured their lives for the benefit of the firm in large amounts was not admissible as reflecting on their intent to defraud their customers, such evidence having no tendency to refute the State's evidence of overt acts in pursuance of the alleged conspiracy, or to prove that the deceptive effect of such acts was not intended.　　pp. 624, 625

That, on the cross-examination of customers of defendants' firm, questions as to the prices at which they bought certain securities were disallowed did not involve reversible error, in view of the fact that the securities were sufficiently valuable to be contracted for, and that the large total value of those which the firm could not deliver was definitely proved.　　p. 625

The State was properly allowed to ask one of defendants on cross-examination to state the valuation at which the firm had received a bond in exchange for certain stock.　　　　　p. 625

On the prosecution of members of a firm of stockbrokers for conspiracy to defraud its customers, the exclusion of questions, on the cross-examination of certain of such customers, as to their purchases through the firm of securities other than those about which they had been questioned in chief, did not involve an improper exercise of the court's discretion, even though the result of the cross-examination would have been to disclose that no losses were incurred in many of such other transactions.
　　　　　　　　　　　　　　　　　　　　pp. 625, 626

Cross-examination must be limited to inquiries pertinent to the subject of the examination in chief, unless the party desiring to extend the scope of the investigation makes the witness his own for that purpose.　　　　　　　　　　　p. 626

While the accused may be cross-examined concerning any matter pertinent to the issues on trial, such a rule does not

apply to any witness in a criminal case who was affected by the conduct for which the defendant is being prosecuted.

p. 626

The exclusion, on the cross-examination of a customer of defendants' firm, of a question referring to a statement sent to him by the firm, which he had with him, was not erroneous, there being no reason to suppose that the statement would have furnished any information upon the subject of his testimony in chief, there being evidence in the case that such statements furnished no such information, and defendants having the privilege of offering such statements as part of their own proof or of making the witness their own for the purpose of such an offer.                 p. 627

Letters sent, in the name of a firm, by one of its employees, from the firm's office in the usual course of business, are admissible against members of the firm.                 p. 628

Testimony by a customer of defendants' firm that a clerk at. the firm's place of business had referred to certain stock, purchased by the witness, as being ready for delivery within a few days, and that the clerk in charge of a settlement made by the witness, for securities purchased, had made the suggestion, which was accepted, that they be left for safekeeping, and further said that he could not get them for the witness at that time, was admissible as tending to prove by the declarations of the firm's agents, within the scope of their employment, its possession of securities which were alleged to have been lost to the purchasers as a result of the conspiracy charged.       p. 628

A witness for the State having testified on cross-examination that he had not written to defendants' firm in regard to his account because he could not write, the exclusion of a question subsequently asked him, as to whether he had not sworn to the contrary at the time of his naturalization, was not reversible error, the inquiry as to whether he had written to the firm or could do so being comparatively immaterial.       pp. 628, 629

On a prosecution of members of a firm of stockbrokers for conspiracy to defraud its customers, a witness having testified that he deposited some liberty bonds with defendants' firm and did not authorize their sale, a question asked on his cross-examination as to whether he had signed any paper admitting he had sold the bonds was properly excluded, such an indefinite inquiry, without presentation of the paper, not being the

proper method of laying a foundation for the impeachment of
the witness.                                              p. 629.

On the prosecution of members of a firm of stockbrokers for
conspiracy to defraud its customers, the bankruptcy petitions
of defendants and the accompanying schedules, filed concur-
rently with the close of the business operations by which the
purposes of the conspiracy were alleged to have been promoted,
were admissible against them.                            p. 629

The exclusion of evidence that one of defendants, by his
constant presence at the office of the firm, fully earned his
salary, was not reversible error, since the jury could have had
no doubt, in view of admitted testimony, as to the rendition by
defendants of constant and active service in the business.

p. 630

Evidence that there were three other "partial payment" bro-
kerage houses in the same city, whose telegraphic quotation
service was withdrawn by the New York Stock Exchange at
the same time that defendants were deprived of that accommo-
dation, was irrelevant.                                  p. 630

*Decided April 30th, 1924.*

Appeal from the Criminal Court of Baltimore City
(STEIN, J.).

Criminal proceedings against Allen B. Lockhart, R. Tynes
Smith, Jr., R. Earl Thomas and Herman Zeusler. From
judgments of conviction, said Lockhart and Smith separately
appeal. Affirmed.

The causes were argued together before THOMAS, PATTI-
SON, URNER, ADKINS, OFFUTT, and DIGGES, JJ.

*Robert R. Carman,* with whom were *William Curran,
Harry W. Nice,* and *Keech, Deming, Kemp & Carman* on the
brief, for the appellants.

*Thomas H. Robinson, Attorney General,* and *Herbert
Levy, Assistant Attorney General,* with whom was *Herbert
R. O'Conor, State's Attorney for Baltimore City,* on the
brief, for the State.

URNER, J., delivered the opinion of the Court.

As members of the firm of Smith, Lockhart and Company the appellants were engaged from August 1st, 1920, to August 9th, 1922, in the stock and bond brokerage business in the City of Baltimore. The business was owned principally by the appellants, only small proportionate interests being held by the three other members of the firm. The appellants and two of their co-partners were charged by the indictment in this case with having conspired to cheat and defraud the firm's customers. All of the defendants were convicted and were sentenced to pay certain fines and to be confined in the penitentiary for specified terms. The imprisonment provisions of the sentences were suspended as to the two defendants who had minor interests in the partnership, and they have not appealed.

The transactions of the firm with its customers were mainly conducted upon what was known as the partial payment plan. Purchasers of stocks or bonds who bought on that plan would make initial deposits on account of the price and would pay the balance in monthly instalments. In consideration of an extra commission the firm guaranteed the purchasers against any additional calls, if the monthly instalments were regularly paid. It was agreed that the firm should retain title to the securities purchased until the monthly payments were completed. The securities were to be delivered to the purchasers upon their request. In the meantime the firm was at liberty to hypothecate the stocks and bonds so bought, but all dividends or interest payments received by the firm were to be credited to the buyer's accounts. In the event of the failure of a purchaser to make his initial or any stipulated monthly payment, the firm had the right, after due notice, to close his account and to secure a settlement.

A booklet issued by the firm, for the purpose of inducing investors to deal with it on the partial payment plan, contained the assurances, among others, that its capital was "more than ample" to carry on a business of the kind de-

scribed, that the firm would pay for and receive the securities ordered by its customers, that it would not sell them without giving the purchasers prior notice, and that they could direct the sale of securities at any time and obtain the profit from their appreciation, thus having "all the advantages of speculation without the attendant risk." The salesmen of the firm, in soliciting business, acted under instructions to tell prospective investors that that stocks or bonds bought by them would not be sold unless their accounts were not properly maintained or unless they ordered a sale.

The volume of the firm's business was large. It conducted about a hundred and twenty-five stock and bond transactions daily. The number of its accounts approximated twenty-five hundred. During the two-year period we have mentioned its commissions amounted to $274,000, and its expenses to $182,-000. When its operations ended on August 9, 1922, it was insolvent to the extent of more than $2,500,000. It was then accountable to its customers for 180,000 shares of stock, of which it had only about 57,000 shares, and for bonds of the par value of $1,273,400, which was $690,750 in excess of the par value of those it could have delivered. The serious losses thus incurred by the numerous patrons of the partnership were chiefly due to the fact that it was without the necessary capital to finance their purchases on the plan which it specially promoted. It bought on a marginal basis the securities required to fill the orders of its customers, and it was subject to calls for cash or collateral to cover depreciations. It was prevented by its agreement from having recourse to its customers to make additional payments because of any decrease in the value of stocks and bonds bought for their account. But the securities they had purchased, and on which they were making monthly payments, were utilized by the firm as the principal means of meeting the requirements of its marginal contracts. Compulsory sales of the securities pledged for that purpose resulted from a decline in their market value and from the inability of the firm to sufficiently protect the margins with cash or other collateral. The funds produced by the monthly payments of investors were applied,

but were not adequate, to the purchase of securities to replace those which had been hypothecated and sold. An advance in market prices in the fall of 1920 placed the firm for a short time in a condition of solvency. Except during that brief period its liabilities always largely exceeded its assets. The partnership began its existence on August 1, 1920, with an excess liability of $240,444.58. This was assumed by it as the successor of the corporation by which the business was previously conducted and which the appellants had controlled.

Notwithstanding the fact that securities bought for customers had been sold, amounts representing the dividends or interest thereon were regularly credited to their accounts with the firm. When a customer completed his monthly payments and asked for his securities, the firm would buy them in the market, if necessary, in order to make the delivery. The effect of this course of dealing was to leave the customer in ignorance of the fact that the securities he originally bought had been sold because the firm was unable to pay its debt for which they had been pledged.

The operations of the firm were terminated on the withdrawal by its New York correspondent of the telegraphic quotation service upon which it was dependent. Its members thereupon applied for the benefit of the bankruptcy law.

The defendants were prosecuted upon the theory that the representations they made and the methods they employed, in the prosecution of their brokerage business, were in pursuance of a conspiracy to defraud by inducing their patrons to make investments under deceptive and unsafe conditions by which they were exposed and subjected to large pecuniary losses. It was insisted by the defendants that no such purpose was conceived or sought to be accomplished, that they made no sales of their customers' securities voluntarily, that they were not insolvent in the usual business sense of the term, and that, but for the action of their New York correspondent, their operations would have been continued, and a future improvement of market conditions might reasonably have been expected to retrieve all the losses which were sus-

tained. It is with reference to the facts and theories which we have briefly indicated that many of the rulings questioned by the appeal must be considered.

There was a demurrer to the indictment. By our recent decision in the case of *Archer and Wilson* v. *State* ante p. 128, an indictment similar to the present one was held not to be demurrable. The reasons assigned for that ruling, in the opinion delivered by JUDGE ADKINS, support our views that the demurrer in this case was properly overruled. It was argued on the present appeal that the indictment is defective in not alleging that the defendants knew of the insolvency which it describes during the course of the dealings to which it refers. This is not a well-founded criticism. The indictment, in each of its counts, charges that the defendants' firm was insolvent, and that, well knowing this fact, they conspired to defraud its customers by certain false pretenses. It is suggested also that in referring to the definition of insolvency in the former indictment as surplusage, we may have been influenced by the fact that a jury trial was waived in that case, and it is urged that such a theory of insolvency, which is said to be incorrect, was prejudicial to the defendants in the trial of this case before a jury. The sufficiency of the indictment must be considered without regard to the method of trial adopted. The allegation as to the financial condition of the defendants was material because of its relation to the other averments of the indictment. It was with reference to the defendants' alleged knowledge of the insufficiency of the firm's assets to pay its liabilities, and not with a view to any particular standard of insolvency, that the charges of conspiracy to deceive their customers by false pretenses was preferred. This is clearly explained in the prior opinion.

An application for a change of venue was made and refused. The grounds of the application were similar to those upon which a petition for the same purpose in the *Archer and Wilson* case was based. It was held that the refusal of the trial court to grant that petition was not an abuse of its discretion. It is said, however, that the recent trial and convic-

tion of Archer and Wilson in the same court, on a similar charge, probably had the effect of intensifying the feeling against these defendants which their petition for removal described. This was not one of the reasons assigned in the petition, but it may have been suggested to the court below when the petition was submitted. It does not, in our opinion, afford sufficient ground for a decision that the discretion of the court was abused in its ruling upon the application. *Archer and Wilson* v. *State, supra; Lanasa* v. *State,* 109 Md. 602; *Downs* v. *State,* 111 Md. 241.

There were motions for a bill of particulars and for severances, upon which the lower court ruled adversely. These rulings will be affirmed in conformity with our decision on motions to the same effect in the *Archer and Wilson* case.

Some of the most important questions to be decided on this appeal arise on exceptions taken to the refusal of the trial court to allow the defendants certain challenges for cause when the jury was being selected. By statute the defendants were given the privilege, also accorded to the State, of striking four from a list of twenty jurors drawn from the whole panel. Code, art. 51, secs. 13, 17. Before exercising this right the State and the defendants were entitled to have a preliminary examination for the purpose of securing a list of twenty jurors who were free of any bias or prejudgment, and as to whom no other ground of disqualification existed. *Hamlin* v. *State,* 67 Md. 333. The procedure adopted in this case was to call talesmen and examine them successively as to whether they had formed or expressed any opinion as to the guilt or innocence of the accused, and to ask them other questions in reference to their competency to render an impartial verdict. It was announced by the court that both sides would be given every facility, without regard to their legal rights, to secure a satisfactory jury, and that the court would not "within reason" be "bound by the number of challenges, and assumed that each side would make its objections honestly." After forty-four talesmen had been called and examined, of whom eleven were accepted and thirty-three excused, the court stated that "each side would

be permitted to strike from the eleven talesmen so accepted as many as they chose without giving reasons therefor, and that thereafter and until the jury panel should be completed, each side would be allowed four more peremptory challenges." Thereupon, as the record states, "counsel for the traversers and for the State each availed themselves of this privilege and struck three men from the eleven so accepted as aforesaid, leaving five men in the jury box." The selection of the jury then proceeded, and when it was completed four additional peremptory challenges had been used by the defendants and the same number by the State. Two of the additional challenges used peremptorily by the State were applied to jurors who had been accepted before the court's change of policy as to the selection was announced. It is complained by the appellants that they were in effect deprived of the benefit of three peremptory challenges because it was necessary to use them in excluding three jurors as to whom valid challenges for cause are said to have been improperly disallowed.

One of those challenges was applied to a talesman who testified that he did not know the defendants, and that he had neither formed nor expressed any opinion as to their guilt or innocence. He stated that he read newspaper reports of their failure, but that he had reached no conclusion as to the case, and any opinion which he may have formed as the result of his newspaper reading could be removed by the evidence. In that connection he used the expression, "It would require simply evidence enough to convince me the man is not guilty." The court then asked the talesman whether he understood that the State would be required to prove the defendants guilty beyond a reasonable doubt. His answer was in the affirmative. He was then told that when "a man comes in a court charged with a crime, the presumption of innocence is in his favor," and the question was then asked: "Now in passing upon the evidence in this case if you are selected as a juror, could you give the benefit to the traversers here of that reasonable doubt and determine from all the evidence whether they are innocent or guilty?" To this the

talesman replied: "I could say that I would give them a fair trial, and go according to the evidence." An exception was taken to the refusal of the court to permit the counsel for the defendants to ask the talesman whether he would expect them to prove that they were innocent. There was no error in this ruling. The same question had previously been asked and the talesman answered that he would give them the benefit of a reasonable doubt and "a fair and square trial." It was properly ruled that the talesman was qualified. *Garlitz* v. *State,* 71 Md. 293. There was no reasonable ground for the apprehension that he would consider the defendants guilty unless they proved their innocence, but his answers to the questions propounded to him clearly showed that he understood it to be the duty of the State to prove them guilty beyond a reasonable doubt. It appears to have been solely because he was supposed by the defendants to have an uncertain conception as to the burden of proof in the case that the challenge for cause was interposed. After it was disallowed the defendants challenged the talesman peremptorily.

Objection was made by the defendants to another talesman because of their impression that he had indicated some prejudice against the business of stock brokers. In the course of his examination he said that he did not have "anything particular" against such brokers, but that he "let them alone" and had "no use for them," and did not "believe in" the business. In answer to the court's question as to whether he had any feeling against stock brokers, he said, "Well, yes, your Honor." He had previously said: "I have no prejudice against them, but I don't want to do any business with them." He assured the court that he had not formed or expressed any opinion as to the guilt or innocence of the accused, and that he would render "a proper verdict" according to the evidence in the case. A challenge for cause was attempted by the defendants, but it was denied.

In 16 *R. C. L.* 268 it is said: "The courts nearly all agree that where the prejudice is simply against the par-

ticular business, and not against the defendant, the juror is
not thereby disqualified." This statement is supported by
a reference to citations in 20 *Annotated Cases,* 1312. It
does not appear from the answers of the talesman to whom
the objection was made that he had any prejudice against
stock brokers as a class that would affect his ability or dis-
position to fairly consider the evidence and to reach a just
conclusion. There is no sufficient reason for a decision that
the ruling of the trial court on the challenge was wrong. But
by the use of another of the defendants' peremptory chal-
lenges, the talesman was dismissed.

After further examinations had been conducted and eleven
talesmen had been accepted, the next one called was found
from his testimony to be office manager for an employer who
was a creditor of the defendants' firm, and who incurred a
loss through its failure. For that reason, and because he
had heard his employer discuss the case, the defendants chal-
lenged him for cause. The challenge was overruled by the
court on the ground that, according to the talesman's testi-
mony, he had not formed any opinion as to the guilt or in-
nocence of the defendants. The talesman thereupon took his
seat in the jury box, and if he had been finally accepted, the
panel would have been complete. Immediately after the
ruling that the last-mentioned talesman was qualified, the
State peremptorily challenged one of the talesmen who were
accepted before the order allowing four additional challenges
to each side became effective. Two other talesmen were
called, examined and accepted. The State challenged an-
other of the group first chosen. There were then in the jury
box eleven talesmen who had been approved by both sides
and the one whom the defendants had unsuccessfully chal-
lenged, because of his employer being a creditor of their
firm, but against whom a peremptory challenge had not yet
been used. The examination of other talesmen was con-
tinued until the court adjourned for the day. On the next
morning, before the jury was completed and sworn, counsel
for the defendants proffered the testimony of four jurors,

serving in the Superior Court of Baltimore City, that the
talesman last objected to had expressed to them an opinion
unfavorable to the defendants, and had stated his desire to
become a member of the jury by whom they would be tried.
This proffer was rejected, the court stating that it saw no
reason to change its ruling, but would still rely upon the
talesman's own testimony, and would not disqualify him
even if the impeaching testimony were received. The third
of the defendants' four additional peremptory challenges was
then utilized and the talesman was discharged.

Another talesman was called, and after examination was
accepted both by the defendants and by the State. A previ-
ously accepted talesman was then peremptorily challenged
by the defendants, by which action their peremptory chal-
lenges were exhausted. The next talesman testified that he
was not acquainted with any of the defendants, that he had
not formed or expressed any opinion as to their guilt or in-
nocence, and that he had no prejudice of any kind that would
prevent him from rendering an impartial verdict upon the
evidence. It was proposed by the defendants to challenge
this talesman peremptorily, but the court rejected the pro-
posal, and he was accepted as the twelfth member of the
jury, who were then sworn.

The refusal of the court to allow the last challenge for
cause to which we have referred was erroneous. The rela-
tions sustained by the talesman to one of the class of per-
sons whom the defendants were accused of having defrauded
should in itself have been a sufficient inducement to favor-
able action on the defendants' objection. As office manager
for an employer who suffered loss from the very conduct
which the jury would investigate, the talesman had an in-
terest which naturally raised a doubt as to whether he would
be able to exercise an impartial judgment upon the important
issue to be decided. If the employer had been a technical
party to the case, there could be no question but that the
talesman would be disqualified. 2 *Poe's Pl. & Pr.,* sec. 254;
16 *R. C. L.* 273; 24 *Cyc.* 276; *Crawford* v. *United States,*

212 U. S. 183.   It was because of a wrong alleged to have been committed against the talsman's employer and others with whom the defendants had dealt that they were being prosecuted.   There is ample reason for applying to a talesman having such an interest the same rule of disqualification to which he would be subject if his employer had been a party to the proceeding.

But in addition to that consideration there was the proffer made by the defendants to prove that the talesman's attitude towards them was antagonistic.   If he had actually expressed an unfavorable opinion as to their innocence and a desire to serve on the jury impaneled to hear and decide their case, there is no reason why such a vitally important fact should not have been considered by the court and held to be conclusive proof of incompetency.   The testimony of the talesman that he had not formed or expressed an opinion as to the guilt or innocence of the accused, and was not prejudiced against them, should not have been regarded as having a controlling effect upon the court's judgment.   In 16 *R. C. L.* 283 it is said:   "While the juror must decide for himself whether his opinion is such as to prevent an unbiased verdict, yet he is not the judge of his own competency, of his own impartiality, and of his own freedom from prejudice. No statute can clothe him with such judicial discretion and power.   The competency of the juror is left to the discretion of the court; and in the exercise of this duty the trial court is not limited to the answers made by the juror, but must be satisfied from all the circumstances, as well as the examination, that the juror is competent."   Independent investigation of a juror's competency may be obviated by the exercise of the court's discretionary right to excuse.   This would obviously be the proper course when a juror's qualifications are challenged on the basis of such a definite proffer of proof as the one made in this instance.

Under the circumstances shown by the record we are of the opinion that the challenge for cause directed against the talesman referred to should have been allowed, and if the

necessary use of a peremptory challenge to exclude him had involved an abridgment of the defendants' legal challenge rights, we should not hesitate to reverse the judgment and remand the case for a new trial. If the statutory limitation as to the number of peremptory challenges had been duly applied in the selection of the jury, a ruling which rejected a valid challenge for cause, and thus required the employment of a peremptory challenge to dismiss the objectionable talesman, would be reversible error because of its practical reduction to that extent of the number of such challenges which the defendants were legally entitled to use in the exercise of their own discretion. But the jury was selected in pursuance of an extra-statutory procedure in which the defendants acquiesced, and in the course of which they were accorded and used peremptory challenges in excess of the four permitted by the statute. In originally and correctly ruling that each side was entitled to only four peremptory challenges, the trial judge informed the counsel for the State and defendants that every opportunity would be given to secure a panel of jurors against whom there could be no reasonable objection, even if the legal number of peremptory challenges should be exceeded. It was not until eleven talesmen had been accepted out of forty-four examined that a limitation was imposed by the court upon the previously unlimited challenge privilege which it had granted. Subsequently the defendants used seven peremptory challenges, and the State an equal number, including the "four more" which the court had announced its intention to allow. It thus appears that the defendants had the benefit of peremptory challenges beyond the statutory number, independently of the one which an erroneous ruling compelled them to use for the exclusion of a talesman whose competency was disputed. In the exercise by the State of its equal privilege to challenge there was no impairment of the defendants' right to be tried by a properly qualified jury. As the Supreme Court said in *Hayes* v. *Missouri*, 120 U. S. 71, "The right to challenge is the right to reject, and not to select a juror."

The announcement by the court below that four additional peremptory challenges would be allowed may have encouraged the defendants to utilize more freely the privilege, simultaneously given, to challenge without restriction any of the talesmen already accepted, but the important fact remains that they were permitted to use more peremptory challenges than they could rightfully have claimed under the law.

In the case of *Stroud* v. *United States,* 251 U. S. 15, 380, it was held that, as the defendant, at his trial for a homicide, was allowed and used twenty-one peremptory challenges, when he was entitled to only twenty, the use of one such challenge against a juror as to whom a challenge for cause was improperly overruled was not a sufficient ground for a conclusion that the defendant's rights had been abridged to his prejudice.

The deviation in this case from the statutory policy as to the allowance of peremptory challenges cannot be given our approval; but the defendants assented to the unusual procedure adopted by the court below, and it resulted in the enlargement of their challenge rights. It is clear that they could not reasonably complain of the irregular method, thus accepted, by which that result was accomplished. If the legal right of the defendants to the use of peremptory challenges had been actually reduced by any of the trial court's rulings, we should not require affirmative proof of resulting injury as a condition of reversal. But when it appears that in consequence of an extraordinary procedure, conducted with their assent, the defendants had the use of peremptory challenges beyond the legal limitation, apart from the one expended for the exclusion of the talesman who should have been excused for cause, and when for that reason no restrictive effect upon their legal rights can be attributed to the ruling found to be erroneous, the fact that the record does not suggest to us any reason to doubt the competency or impartiality of any member of the trial jury as finally impanelled is a material consideration supporting the view that the error is not reversible.

In view of the special conditions described, we would not be justified in reversing the judgment and awarding a new trial upon the theory that the rights of the defendants in regard to the selection of the jury were injuriously restricted.

In the cases of *Johns* v. *State,* 55 Md. 350, and *Garlitz* v. *State,* 71 Md. 293, this Court reviewed rulings which disallowed challenges for cause, but no such questions as the ones now under decision were presented.

The rulings made by the court below during the selection of the jury were the subjects of three of the one hundred and fifty-three exceptions in the record. All of the remaining exceptions refer to rulings on the admissibility of evidence. Exceptions 4 to 44, and 83 to 123, relate to the admission of papers and records of the defendants which were received from them, and produced at the trial, by the receivers appointed in their bankruptcy proceedings. It was determined in the *Archer and Wilson* case that evidence so obtained is admissible. Those exceptions have, therefore, been abandoned. It is not contended, and we do not find, that any reversible error was committed in the rulings mentioned in exceptions Nos. 56, 57, 61, 63, 71, 73, 81, 124, 130, 134, 135, 136, 137, 140 and 144.

The 45th exception was taken because of the court's refusal to strike out an answer given in the course of the testimony of an accountant, who had been employed by the receivers in bankruptcy to audit the defendants' books of account. He had testified for the State as to entries in the defendants' stock and bond ledger, and in their profit and loss account, relating to the sale of "customers' securities." On cross-examination he testified that by "customers' securities" he meant those with which customers were credited. He said that in the forced sale of such securities there were equities of customers involved. In answer to a question asked on the theory that the securities referred to did not belong to customers, the witness said: "They were selling customers' securities because those securities were credited to those cus-

tomers, and they were supposed to hold those securities in trust for their customers." This was the answer to which the 45th exception was directed. The statement that the securities were held in trust for customers is said to have been prejudicial to the defense as the expression of an opinion which the witness was not qualified to give upon an important issue which the jury was to decide. In the opinion delivered in the *Archer and Wilson* case it was said that a broker is a "quasi trustee or agent to execute the orders of his customers, and can only use their securities as directed by them, or to protect himself as to liabilities properly incurred for them." When the undisputed facts of this case are considered, we see no injury to the defendants in the explanatory statement by the witness that the securities bought for their customers were supposed to be held in trust. The plain effect of the uncontradicted evidence as to the representations made to customers was to prove the existence of a virtual trust of the stocks and bonds for which they were making payments. It was understood that the securties could be pledged for loans contracted by the firm, but assurances were given that it would not sell them without notice to the customers, and that it was able to protect the investments. The issue in the case was not whether a trust existed, but whether the defendants unlawfully conspired to deceive and defraud their patrons. The statement objected to was not prejudicial and the ruling was not reversible in view of all the circumstances.

The 46th exception disputed a ruling which precluded a cross-interrogatory as to the average amount of capital employed in the brokerage business in Baltimore. This question was propounded after the accountant, who was being cross-examined, had testified that forced sales of securities were made because the defendants did not have sufficient capital to carry on their business, and that the average broker has enough capital to prevent such occurrences. The inquiry, however, was not relevant to the issue. Proof of the amount of capital ordinarily used in the brokerage business

would not have reflected upon the question as to whether the defendants had a sufficient amount in view of the volume and requirements of the particular business in which they were engaged.

The 47th, 141st, 142nd and 143rd exceptions relate to offers by the defendants to prove that national and state banking institutions were not required to conform to changing market conditions in the appraisement of their securities for the purposes of their financial reports. It was contended on behalf of the defendants that they ought not to be considered insolvent merely because their assets may have become insufficient to meet their liabilities as the result of a temporary decline of market values, when previously, and subsequently to the close of their business, there were periods of large appreciation. But the admissibility of the proffered evidence could be considered only with reference to the specific conditions existing in the defendants' own business, and evidence on that subject was freely admitted. Testimony as to privileges granted banking institutions in regard to appraisals of their securities would not have tended to prove that the defendants were able to discharge the obligations which they assumed.

Exceptions 48 to 53 and 55, resulted from the court's refusal to permit the defendants to prove, on the cross-examination of an accountant witness for the State, that the auditors employed by the receivers in bankruptcy had sent statements of account to the customers of the defendants' firm, and that the statements so furnished were similar to those regularly issued by the firm itself during the period of its business activity. The statements sent by the receivers, like those sent by the firm, credited the customers with securities which they had purchased, and in many instances made no mention of the fact that they had since been sold. As thus issued by the defendants' firm, the statements were claimed by the prosecution to be deceptive and fraudulent in creating a false belief on the part of the customers that the firm held the securities which they had ordered, and in thereby inducing them to continue their monthly payments. It was the

purpose of the defendants to mitigate the force of that theory by means of the rejected testimony that the receivers of the firm also issued statements of account to customers in which the sale of securities credited to them was not disclosed. There was an important difference in the circumstances under which the two classes of statements were issued and in the purposes which they were intended to fulfill. The firm's statements were sent out when its business was in active operation, and they were designed to promote its continuance, while the receivers' statements were furnished after the business had ended, and their object was merely to inform those who had been dealing with the bankrupt firm as to the condition of their accounts appearing on its records. The issuance of such statements by the receivers could not affect the significance attributed by the State to those which the firm had issued.

The 54th, 128th and 129th exceptions refer to the defendants' offers, which were refused, to prove that they had insured their lives for the benefit of the firm to the total amount of $405,500, their policies having an aggregate surrender value of $10,893.72. Evidence of that fact was said to reflect upon the question as to the existence of an intent to commit the fraud charged in the indictment. It was argued for the defendants that their conduct in providing life insurance in such large amounts for the benefit of the firm was inconsistent with the theory that they were conspiring to defraud its creditors and patrons for whom the insurance might provide some protection. The relation of the insurance to the course of the defendants' dealings with their customers was too remote to have any relevancy to the issue which was to be determined. The question before the jury was whether the defendants conspired to defraud by means of certain misleading methods and misrepresentations. If the proposed testimony in regard to their life insurance, and to the fact that the firm was the beneficiary, had been admitted, it would have had no tendency to refute the State's proof of overt acts in pursuance of the alleged conspiracy, nor would it have tended to prove that the deceptive effect

of such acts was not intended. The provision made for the insurance may have reflected the expectation of the defendants that, as a result of future market changes, their business could be continued without eventual loss to any one concerned. But such a provision would not be incompatible with the formation and execution of a design to deceive the customers as to the real conditions of the business and as to the methods by which it was actually conducted.

The 58th, 59th, 60th and 67th exceptions have reference to rulings which disallowed questions on the cross-examination of two customers of the firm as to the prices at which they bought certain stocks and bonds. These inquiries might well have been permitted, but there was no injurious and reversible error in the rulings, in view of the fact that the securities were sufficiently valuable to be contracted for, and that the large total value of those which the firm could not deliver was definitely proved. As against the 133rd exception the court allowed the state's attorney to ask one of the defendants on cross-examination to state the valuation at which the firm had received a bond in exchange for certain stock. This ruling is said to have been in conflict with those to which the 58th, 59th, 60th and 67th exceptions were reserved. But the former rulings may have resulted from the view that the questions to which they related were not within the proper scope of the cross-examination of the witnesses then testifying. In our opinion the latter ruling was correct and the former ones were not injurious.

Exceptions 62, 64, 65, 66, 76, 77, 79 and 82 refer to the refusal to permit cross interrogatories which were regarded by the court as applying to purchases of securities other than those about which the witnesses had been questioned in chief. The defendants were not prevented, in the development of their own evidence, from proving generally the firm's transactions with its customers, and they could have made the State's witnesses their own for that purpose, but the question raised by the group of exceptions just noted is whether their right of cross-examination was too closely limited. The 62nd exception is typical. A customer of the firm having testified

in chief that he had bought certain stock on which he had made his monthly payments until the failure of the firm, it was proposed to cross-examine him as to other transactions between them of the same nature. The evident purpose of the examination in chief was to show a specific purchase of stock as to which the firm was in default. This was a distinct subject of investigation to which the testimony of the witness had been confined. A cross-examination of the witness as to other transactions would necessarily have been beyond the limits of the original inquiry. If counsel for the defendants had been permitted to cross-examine these witnesses as to their other transactions with the firm, it would doubtless have been disclosed, and it was in fact otherwise proved, that with respect to many of them no losses by the customers were incurred. But this could not neutralize the effect of the State's evidence that serious losses were eventually sustained by numerous investors because of their confidence in a business which was represented by the defendants to be safely conducted and financially sound, when it was actually operating under precarious conditions in consequence of a deficiency of capital.

It is the recognized rule in this State that a cross-examination must be limited to inquiries pertinent to the subject of the examination in chief, unless the party desiring to extend the scope of the investigation makes the witness his own for that purpose. *Murphy* v. *Stubblefield*, 133 Md. 30; *Mut. Fire Ins. Co.* v. *Ritter*, 113 Md. 163; *Black* v. *First Nat. Bank*, 96 Md. 399; *Duttera* v. *Bablon*, 83 Md. 536; *Herrick* v. *Swomley*, 56 Md. 439; *Griffith* v. *Diffenderffer*, 50 Md. 466. It has been said by this Court that "much must be left to the discretion of the presiding judge in the determination" of such a question. *Black* v. *First Nat. Bank, supra; Mut. Fire Ins. Co.* v. *Ritter, supra.* The rule in criminal cases is that "the accused may be cross-examined concerning any matter pertinent to the issues on trial." *Guy* v. *State*, 90 Md. 29; *Lawrence* v. *State*, 103 Md. 17. It is argued that the same rule should be applicable to a witness in a criminal case who was affected by the conduct for which the defendant

is being prosecuted. But such a witness is not within the reason of the rule applied to a defendant under cross-examination upon the issue of his guilt or innocence of a crime of which he is accused. In regard to the ruling as to the proper scope of cross-examination in the instances mentioned in the exceptions, we are unable to hold that the discretion of the trial court was improperly exercised.

With respect to the 79th exception in the group just considered, the special point is made that it refers to a statement sent by the firm to the witness, which he then had with him, and which might have reflected upon his testimony in chief as to the sale of certain bonds without his authority. There is no reason to suppose that the statements called for would have furnished any information on that subject. Other evidence in the case indicated that they were simply reports by the firm of the accounts of customers, and the appearance of sales items in them would not be evidence that the sales were made with the customers' consent. There was no refusal, however, to permit the defendants to offer the statements as part of their own proof or to make the witnesses their own for the purpose of such an offer.

No reversible error is apparent in the rulings to which the defendants reserved their 68th and 69th exceptions. The witness under examination had testified in chief that he had deposited a bond with the firm as a credit on a new purchasing account which he opened. The bond, he said, was not returned, but he did not testify definitely that a sufficient amount to entitle him to a return of the bond had been paid. When he asked for the bond on the supposition that he had paid enough to entitle him to have it returned, an objection appears to have been raised. He said that he did not attempt to liquidate his account prior to the receivership. After he had been cross-examined, and questioned again by the State on re-direct examination, he was asked on further cross-examination the two questions to which exceptions 68 and 69 relate. The object of those questions was to obtain an answer from the witness that his failure to receive the

bond he had deposited was due to the fact that he was still indebted to the firm for a bond and some stock charged to him in his new account, which the deposited bond was intended to secure. While these questions may have been allowable, the rulings to the contrary were not in our opinion injurious and reversible errors in view of the tenor of the preceding testimony of the witness and the other evidence in the case.

The 70th exception refers to the admission of two letters from the firm to one of its customers reporting a purchase and acknowledging a payment. The ground of the objection was that the letters were sent in the firm's name by one of its salesmen and were not shown to have come to the defendants' knowledge. There was nothing prejudicial to them in the letters. As they were sent from the firm's office in the usual course of its business, we have no reason to doubt their admissibility.

The 72nd and 80th exceptions were to the overruling of motions to strike out answers in the testimony of two witnesses, one of whom stated that a clerk at the firm's place of business had referred to certain stock, purchased by the witness, as being ready for delivery within a few days, and the other of whom said that the clerk in charge of a settlement made by the witness, for securities purchased, had made the suggestion, which was accepted, that they be left for safekeeping, and further said that he could not get them for the witness at that time. In the refusal to strike out this testimony we find no error. It tended to prove, by the declarations of the firm's agents, within the scope of their employment, its possession of securities which were alleged to have been lost to the purchasers as a result of the conspiracy charged.

One of the witnesses for the State, who was a naturalized citizen, in the course of his cross-examination, stated that he had not written to the firm in regard to his account because he could not write. Later he was asked whether he had not sworn to the contrary at the time of his naturalization. An

objection to that question was sustained. This occasioned the 74th exception. The inquiry on cross-examination as to whether the witness had written or was able to write a letter to the firm in reference to his accounts was not sufficiently material to render the ruling reversible.

The 75th exception was to the refusal of the court to permit a witness, who had testified to transactions with the firm through one of its salesmen, to be asked on cross-examination whether any business relations had been opened by the witness with the same person, acting in a different employment, after the firm's business was closed. This was a plainly immaterial question.

A witness who testified that he deposited some liberty bonds with the firm, and did not authorize their sale, was asked on cross-examination, as shown by the 78th exception, whether he had signed any paper admitting that he had sold the bonds. This indefinite inquiry, without presentation of such a paper, was not the proper method of laying a foundtion for the impeachment of the witness, and the action of the court in sustaining an objection to the question was correct.

The activities of the defendants' firm ended on August 9th, 1922, and their petitions in voluntary bankruptcy were filed on the same day. The State offered these petitions and the accompanying schedules in evidence, presumably as admissions of insolvency. In the *Archer and Wilson* case we held that it was an error to admit in evidence the petitions and evidence filed in the involuntary bankruptcy proceedings against the defendants, because the admissions of insolvency in the answers related to a period subsequent to the last overt act proved to have been committed in pursuance of the conspiracy there under investigation. In this case the bankruptcy petitions of the defendants were filed concurrently with the close of the business operations by which the purposes of the conspiracy charged against them are alleged to have been promoted. The petitions and schedules offered were properly admitted. The 125th exception was taken to that ruling.

The amounts of the salaries received by the defendants from the partnership having been proved by the State, it was proposed by counsel for one of the defendants to prove by him that, except during brief summer vacations, he spent every day at the office of the firm actively engaged in its business. The object of the proffer was to show that he fully earned the salary he received. The jury could have had no doubt, in view of the admitted testimony, as to the fact that the defendants rendered constant and active service in the business, and we can see no reversible error in the ruling of the court against the offer to emphasize that fact with respect to the defendant then on the witness stand. This was the subject of the 126th exception.

In the disallowance of the question to which the 127th exception refers we find no reversible error in view of the admitted testimony of the witness.

The reservation of the 131st and 132nd exceptions was made because of certain questions which the State was permitted to ask one of the defendants on cross-examination. The inquiries were upon a subject in regard to which the explanations of the witness were so full and satisfactory that we are unable to see how the rulings could have operated in any way to his disadvantage.

By the 138th and 139th exceptions the defendants complained of the refusal of the court to allow them to prove that there were three other partial payment brokerage houses in Baltimore whose telegraphic quotation service was withdrawn by the New York Stock Exchange when the defendants were also deprived of that accommodation. This was an irrelevant fact, and we do not see how its exclusion could injure the defense.

The 145th to the 153rd exceptions were concerned with the admission of rebuttal testimony, which we think was clearly competent, in answer to the defendants' interpretation of their duty and statement of their intent with respect to the sale or retention of the securities bought for their customers.

The numerous questions presented by the appeal have now been considered, and careful attention has been given to the

able and earnest arguments made in support of the contention that the judgment should be reversed, but we have not discovered in the rulings we have reviewed any adequate reason for a decision to that effect.

*Judgments affirmed, with costs.*