PEARLMAN ET AL. *v.* STATE

[No. 159, September Term, 1962.]

(Five Appeals In One Record.)

252

*Decided July 12, 1963.*

*Motions for rehearing and for stay of mandate filed August 8, 1963, mandate stayed August 9, 1963, rehearing denied and opinion modified as to costs September 9, 1963.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, HORNEY, and MARBURY, JJ.

*Harold Buchman* and *Ralph Frier,* for William Pearlman, William Blank, Blair Brown and Leonard Cohen, part of Appellants. Submitted on brief by *Clement R. Mercaldo,* for Jerome Glass, other appellant.

*Robert S. Bourbon, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, William J. O'Donnell, State's Attorney for Baltimore City, Joseph G. Koutz, Deputy State's Attorney, Russell J. White, Assistant State's Attorney* and *Charles E. Moylan, Jr., Assistant State's Attorney,* on the brief, for appellees.

HORNEY, J., delivered the opinion of the Court.

The defendants, William Pearlman, William Blank, Leonard Cohen, Blair Brown and Jerome Glass, were convicted by the Criminal Court of Baltimore sitting without a jury of conspiracy to cheat and defraud, and have appealed.

Trading and doing business under various names, the defendants, who were engaged in the business of selling home improvements and in the financing thereof, were indicted (with others) in a two-count indictment for conspiring to cheat and defraud their customers, financial institutions which financed home improvement sales, and stockholders of the corporations the defendants organized for the purpose of doing business, and such other persons and corporations as might thereafter have dealings with them. Both counts charge a conspiracy to cheat and defraud, varying only in the phraseology of the objective or purpose sought to be accomplished by the conspiracy.

Specifically, the first count charged that the defendants un-

lawfully conspired "by wrongful and indirect means and divers false pretenses and other false and subtle means and devices to cheat, wrong, defraud and impoverish" such customers, financial institutions and stockholders of their property and money.

The second count—the phraseology of which was similar to the first—charged that the defendants unlawfully conspired "by wrongful and indirect means and devices to obtain and acquire for themselves" the property and money of such customers, financial institutions and stockholders "with the intent then and there fraudulently and maliciously to cheat, wrong, defraud and impoverish" such customers, financial institutions and stockholders.

The defendants moved to dismiss the indictment on the grounds that it was vague and indefinite in various respects, but the trial court in a trial memorandum ruled that the indictment adequately informed the defendants that they were charged with a conspiracy to effect an unlawful objective "by wrongful and indirect means and divers false pretenses" and denied the motions. The defendants then moved for particulars, but the motions therefor were also denied.

One of the corporate entities under which the defendants did business was known as the Reynolds Engineering & Supply Co., Inc. The defendants were the officers and managerial executives of the company. While most of the sales were made by salesmen who were regarded as independent contractors and were paid on a commission basis, some sales were made by company executives and officers. The sales were generally made on credit, the customer paying in installments over a period of time.

Between October of 1956 and November of 1959, the Reynolds Company processed more than twenty-five hundred sales. When a sale was made, the salesman would have the customer sign a contract which set forth the work to be done and the estimated cash price, or, if a time plan was desired, the amount of each monthly payment and the total number of payments were also set forth. In arriving at the cash price, it was customary to double the estimated cost to the company.

And on a time plan an additional ten per centum carrying charge per year was added to the cash price. The customer, usually without knowing it, was also required to sign in blank a confessed judgment note, a mortgage securing the note, a fire insurance endorsement, an authorization permitting a credit check and an estoppel form. Subsequently, an officer or executive of the company would check with the customer concerning the order and the adequacy of the proposed price. If the credit of a customer was approved, a typed, clean contract would ordinarily be prepared in final form, to which the customer's signature would be obtained. The company would fill in the terms of the already-signed note and mortgage, the mortgage stating the full "time" price as the amount secured.

Reynolds had arrangements with financial institutions for the discounting of its paper. It would assign the notes and mortgages to the financing institution with recourse, and, after it had accumulated a specified reserve, it would receive a part of the cost of a job from the lending institution. If an account became delinquent, the lender would return the note and reassign the mortgage to Reynolds. Reynolds would then be required to replace the delinquent account with a new note and mortgage or the institution could withdraw the amount of the delinquent account from the reserve. When a loan was paid in full, the mortgage would be reassigned to Reynolds and released.

One of the company salesmen testified that the defendants Pearlman (president of the company) and Blank (its secretary-treasurer) had told him and other salesmen at a sales meeting not to let customers know that they were in fact signing mortgages; that the salesmen were to so arrange the papers to be signed as to conceal the text of the mortgage; and that if a customer asked what the instrument was, they were to say it was mortgage insurance. Two other salesmen also testified that Pearlman and Blank had told them not to let customers know they were signing mortgages, but to tell them, if they asked, that the instruments were insured mortgages. A bookkeeper-secretary employed by Reynolds for a

short time testified that she asked Pearlman how they got customers to sign mortgages, and he replied they were told that they were signing for loan insurance to pay the loan in case the customer died.

The State also called sixty-four of the customers who testified, in substance, that they did not know, at the time of signing, that they had signed mortgages, and, in some cases, that they had been told that they were not executing mortgages.

Two attorneys (holding notary commissions), who were employed by Reynolds to visit customers and obtain their acknowledgments to the previously signed mortgages, or secure so-called "confirmatory" mortgages, as the case might be, testified that they were instructed to, and did, explain to the customers the nature of the mortgage instruments. Other evidence was produced by the defendants to contradict or refute that produced by the State.

In its trial memorandum, the court, in speaking of the unlawful means employed to carry out the unlawful object of the conspiracy, found, among other things, that the five defendants who appealed had formulated a scheme to overcome the general reluctance of customers to execute mortgages for home improvements by inducing them to sign blank forms which they did not know were mortgages; that home improvements had been sold and mortgages fraudulently obtained from customers "by concealment, trickery and misrepresentation"; that when the defendants had a legal obligation to speak, they "spoke falsely"; and that the signing by customers of blank mortgages had "facilitated the operation of the illegal plan and its objectives," and entered verdicts of guilty against each of the defendants.

On appeal the defendants contend (i) that the indictment is so vague and indefinite that they were inadequately informed of the accusations against them in violation of the constitutional requirements; (ii) that the denial of particulars was prejudicial error; (iii) that the convictions violate the due process clauses of the state and federal constitutions because there were such variances between the conspiracy alleged and

the conspiracy found that the defendants were convicted of a crime not charged; and (iv) that the evidence does not support the convictions, particularly that of the defendant Blair Brown.

(i)

The indictment was so framed as to adequately inform the defendants of the charge against them.

Of course, the obtaining of the money and property of others with intent to cheat and defraud is *per se* an illegal objective. Here, the means employed by the defendants—concealment, trickery and misrepresentation to obtain the signing of security instruments—were also unlawful. See *State v. Buchanan,* 5 H. & J. 317 (1821). The question, then, is whether the indictment was sufficient to inform the defendants that they were charged with having used unlawful means to accomplish an unlawful objective.

"[A]n indictment must be so framed as to inform the defendant of the charge against him in order that he may prepare his defense and may also protect himself against a subsequent prosecution for the same offense". *Seidman v. State,* 230 Md. 305, 312, 187 A. 2d 109 (1962). This right is guaranteed by Article 21 of the Maryland Declaration of Rights and the due process clause of the Fourteenth Amendment to the Constitution of the United States.

Nevertheless, the general rule with respect to a conspiracy indictment is that it "need state only the conspiracy and the object of it; the means by which it was intended to be accomplished are only matters of evidence to prove the charge." *Piracci v. State,* 207 Md. 499, 516, 115 A. 2d 262 (1955). See also *Archer v. State,* 145 Md. 128, 125 Atl. 744 (1924) ; *State v. Buchanan, supra.* But it has been held that this rule does not apply to conspiracies to do a lawful act by unlawful means and that in such cases it must appear by the indictment that the means to be employed are unlawful. *Garland v. State,* 112 Md. 83, 75 Atl. 631 (1910). However, the formula for a conspiracy indictment set forth in Chapter 87 of the Acts of 1945, now codified as Code (1957), Art. 27, § 40, requires only a brief statement of the "object of the conspiracy." Stat-

utes prescribing a short form of indictment — provided the simplified form contains the essential elements of the crime it purports to charge—are generally upheld on the ground that the right of the defendant to demand the particulars of the accusation protects him against injury. *Neusbaum v. State,* 156 Md. 149, 156-157, 143 Atl. 872 (1928) ; *Kelley v. State,* 181 Md. 642, 647, 31 A. 2d 614 (1943).

This Court has not heretofore had to decide what effect, if any, the formula prescribed by § 40 of Art. 27 has on the rule laid down in the *Garland* case. And although a question as to it is presented in this case, it is not imperative that we decide it now, and we leave it open. For assuming, without deciding, that the *Garland* rule is still operative, the indictment herein not only charged the defendants with a conspiracy having an ultimate object to cheat and defraud certain classes of persons and corporations with whom the defendants had dealings in the conduct of their business, but also charged them with having employed unlawful means to obtain the objective they sought. While the means are not spelled out, the indictment is otherwise reasonably clear and certain. In it, the defendants are charged with the use of "wrongful and indirect means and divers false pretenses and other false and subtle means and devices" the object of which (as stated in the first count) was to "cheat, wrong, defraud and impoverish" customers, financial institutions and stockholders of their property and money; and (as stated in the second count) the object was to "obtain and acquire for themselves" the property and money of such persons and corporations with the intent to "cheat, wrong, defraud and impoverish" them. This, we think, stated the essential elements of the crime and was enough to adequately inform the defendants that they were charged with a conspiracy to do unlawful acts through unlawful means. This was proper (according to *State v. Buchanan, supra*) and is all that is required by the statutory form of indictment. See *Neusbaum v. State, supra* (at p. 156 of 156 Md.). Even before the effective date (June 1, 1945) of § 40 of Art. 27, the same basic language used in the indictment in this case to charge the defendants with a conspiracy to cheat

and defraud had been regarded by this Court to be sufficient and similar indictments had been held not to be demurrable.

The sufficiency of the indictment in *Blum v. State,* 94 Md. 375, 51 Atl. 26 (1902), which charged the appellants therein and another with conspiring

" 'by means of divers false pretenses and representations, and other false and subtle means and devices to obtain and acquire unto themselves certain properties, moneys, goods and chattels,' of certain corporations and persons named in the indictment, * * * of the value of $2,500, and to cheat and defraud such persons and corporations,"

was regarded as having been "established by the decision in *State v. Buchanan,* 5 H. & J. 317." Obviously, that indictment was remarkably similar to the second count of the indictment in this case. The fact that the *Blum* indictment specified the value of the properties and monies sought to be obtained would seem to be mere surplusage now since § 40 of Art. 27 does not require such an allegation.

In *Archer v. State, supra,* and in *Lockhart v. State,* 145 Md. 602, 125 Atl. 829 (both decided in 1924), where the defendants, who were stockbrokers, were charged in the first four counts of the indictment in each case (in language similar to that employed in the present indictment) with having conspired "by wrongful and indirect means and divers false pretenses and subtle devices to cheat and defraud" their customers, the fifth and sixth counts in each indictment set out what the false pretenses practiced by the defendants were, but this was before the use of a simplified form of indictment had been authorized.

The indictment in *Lanasa v. State,* 109 Md. 602, 71 Atl. 1058 (1909), was even less informative than the indictment in the *Blum* case in that in *Lanasa* it was held unnecessary to describe the particular property which was the object of the conspiracy in an indictment that had charged the defendant with conspiracy with others to injure and destroy the property of a named person.

Since the use of a short form of indictment in conspiracy cases has been permissive, the phraseology of some of the indictments that have met the test of sufficiency has been simplified to even a greater degree. For example, in *Winkler v. State,* 194 Md. 1, 69 A. 2d 674 (1949), *cert. den.* 339 U.S. 919 (1950), an indictment charging that the defendants unlawfully conspired to disturb the peace was held not to be vague and indefinite. In *Hurwitz v. State,* 200 Md. 578, 92 A. 2d 575, and in *McGuire v. State,* 200 Md. 601, 92 A. 2d 582, *cert. den.* 344 U.S. 928 (both decided by this Court in 1952), indictments that did not specify the acts constituting the basis for the charges that the respective defendants had conspired with others to violate the lottery laws were held not to be fatally defective.

It is also contended that the names of the known victims of the conspiracy should have been alleged in the indictment. Even though the object of the conspiracy had been effected with respect to most of the twenty-five hundred victims of the conspiracy before the indictment was filed, it would have served no useful purpose to have named them in the indictment. Nor was the State required to do so. In a case such as this, where a fraud is worked upon customers as a whole, their designation as a class is sufficient. See *Archer v. State, supra* (at p. 144 of 145 Md.), where it was held that it is not necessary to allege the names of the persons conspired against if it is alleged that some of the class were defrauded.

The defendants further contend that each of the counts in the indictment charge what are in reality two crimes—a conspiracy where the object is unlawful and a conspiracy where the means are unlawful. In *State v. Buchanan, supra,* the indictment contained the same two charges, but it was not held to be bad for that reason.

(ii)

The denial of particulars was not reversible error. We see no reason why the trial court should not have required the State to furnish the defendants with the particulars of the offense charged in a manner that would not have disclosed to the defendants the details of the proof upon which the

State relied to make out its case, but we find nothing in the record to show that the defendants were injured by the denial of particulars or that they were put to any real disadvantage in having to present their defense without particulars.

A defendant is not entitled as of right to particulars. Rule 715 a provides that on motion by a defendant, the court may order the filing of a bill of particulars. But in most cases the grant or refusal of particulars is within the sound discretion of the trial court. *Seidman v. State, supra.* And this Court will not reverse a denial of particulars unless there has been a gross abuse of discretion resulting in injury to the accused. *Leon v. State,* 180 Md. 279, 23 A. 2d 706 (1942) ; *State v. Lassotovitch,* 162 Md. 147, 159 Atl. 362 (1932) ; *Neusbaum v. State, supra; Lanasa v. State, supra.* In general the rule in other jurisdictions is in accord with that in Maryland. See the annotation in 5 A.L.R. 2d 444, 447.

The problem with regard to the granting of particulars in cases where the indictment is framed in the formula prescribed by the statute was discussed in *Neusbaum v. State, supra,* and in *Larmore v. State,* 180 Md. 347, 24 A. 2d 284 (1942). In *Neusbaum,* the question was dismissed because it had not been properly reserved for appellate review. And in *Larmore,* the indictment was upheld, but it was pointed out that any generality in the indictment could have been corrected by a bill of particulars.

In defense of the charges against them, the defendants produced forty-six witnesses, including the six defendants on trial (one of the six was found not guilty) who denied their guilt and the existence of and participation in a conspiracy. The greater portion of the testimony of the customers who were called as witnesses by the defendants concerned their awareness of the fact that they knew they were executing mortgages on their properties. In addition to this there was the testimony of the two notaries (who were also attorneys) regarding the exculpatory explanations they made in taking the acknowledgments of customers to the previously executed mortgages and in acquiring "confirmatory" mortgages whenever it was deemed necessary. Since it is obvious that such

testimony was aimed at rebutting and refuting that which had been produced by the State to show the existence of fraud, concealment and misrepresentation in obtaining the mortgages, it is difficult to understand what other defenses the defendants might have made (and none are shown) had they been furnished with particulars. Although some irrelevant testimony was produced to defend against forgery (which the court later stated had not been charged in the indictment), the defendants failed to show how they had been injured or put to any disadvantage by the refusal of the trial court to require the filing of particulars. It seems clear therefore, in the absence of a showing that they had been prejudiced, that the defendants are not entitled to a reversal because of the denial of particulars.

(iii)

There was no variance between the conspiracy alleged and the conspiracy of which the defendants were convicted.

The contention here is that the court, in its pretrial memorandum, ruled that the indictment alleged a conspiracy to achieve only an unlawful objective, and, in its trial memorandum, found that the defendants were guilty of a conspiracy to achieve a lawful objective through the use of unlawful means. We do not agree, and a careful reading of both memoranda shows that such is not the case. In both memoranda, the court pointed out that both counts of the indictment "charge a conspiracy by wrongful and indirect means and divers false pretenses, varying only in the alleged object or purpose to be accomplished by the conspiracy." In the pretrial memorandum, it is apparent that the trial court was of the opinion, and so informed the defendants, that they were charged with a conspiracy to effect an unlawful objective by the use of unlawful means. The indictment in *State v. Buchanan, supra,* was worded in a similar manner and it was not held bad for duplicity. Nor do we find anything in the trial memorandum to indicate, as the defendants contend, that the court found them guilty of a conspiracy having a lawful object which was obtained through unlawful means. On the contrary, we think it is clear that the court based its verdicts

of guilty on the unlawful means the defendants had employed to effect the unlawful objective they sought to accomplish. There was therefore, as we see it, no variance between what the indictment charged and what the court subsequently found as a fact. Since the indictment had charged a conspiracy to do an unlawful act by unlawful means, the defendants could be, and were, properly convicted.

It was also contended that there was a variance because the defendants were accused of conspiring against three classes of persons and corporations but were convicted of conspiracy against only one class. The case of *Archer v. State, supra* (at p. 144 of 145 Md.), settled this contention. Since it was held therein that an indictment alleging "a conspiracy to defraud the general public or a particular class is sufficient," it is apparent that the indictment in this case charging the defendants with a conspiracy to victimize several classes of persons was not improper.

(iv)

The evidence was legally sufficient to support the convictions of all the defendants.

At the trial of this case, the court heard a total of one hundred and fourteen witnesses—sixty-eight for the prosecution and forty-six for the defense. It is not necessary to repeat here even the gist of the evidence that was produced, for all of the defendants, except Blair Brown, seem to concede that there was evidence to prove a conspiracy if what was alleged in the indictment was sufficient to inform them that they had been charged with a conspiracy to accomplish an unlawful objective or purpose by unlawful means. This point (and the others), having been decided adversely to them, the trial court, which had the opportunity to see and hear the witnesses, was in a position to judge their credibility, and we cannot say that the court sitting without a jury was clearly in error in finding a verdict of guilty on the evidence produced.

With regard to Blair Brown, the testimony of one of the salesmen—to the effect that Brown had instructed him not to multiply for a customer the number of months by the amount

of monthly payments totaling the time price of the job—in conjunction with the testimony of five customer-witnesses who made damaging statements against Brown personally—to the effect that he had deceived them by misrepresenting the nature of the mortgages signed, by concealing that mortgages were being signed, or by denying that mortgages would be required—was sufficient to support the verdict of the trial court.

Finding no prejudicial error in the rulings and findings of the trial court, the judgments will be affirmed.

> *Judgments affirmed; one-fifth of the costs to be paid by appellant Jerome Glass; the remaining four-fifths to be paid by the State.*

BRUNE, C. J., filed the following dissenting opinion.

I regret being in disagreement with my colleagues in this case. The basis of my disagreement is not any question as to the sufficiency of the evidence to sustain the convictions, but my belief that the defendants were not adequately apprised of the nature of the charges against them.

The opinion of the Court upholds the sufficiency of each count of the indictment as stating an offense, and in support of its holding cites prior decisions of this Court which have upheld indictments charging conspiracies that were also lacking in specific statements as to the object of the conspiracy or the means of its accomplishment or both. The Court recognizes that the indictment does not adequately inform the defendants of the charges against them by stating that the demand for a bill of particulars should have been granted (at least in part). The Court then holds that the defendants were not prejudiced in their defense by the denial of particulars because of the large number of witnesses and extensive testimony which they were able to produce even without particulars being furnished. This seems to me to amount to a holding that because the defendants knew of their own conduct and misdeeds, they were not prejudiced by not being told specifically what charges they would have to answer. That

may well be true of the guilty, but it would not be true of the innocent. Such a rule would greatly hamper the innocent in the preparation and presentation of their defense and would facilitate their conviction, even if they were in fact innocent. In the event of conviction under such circumstances they would then come to an appellate court with a finding of guilt against them and with serious difficulty in showing prejudice.

Because I think that the affirmance of the conviction here on the ground that no prejudice resulted to these defendants from the refusal of a statement of the particulars of the offense with which they were charged undermines an essential of criminal pleading and the fairness which it seeks to assure for the innocent and the guilty alike, I respectfully dissent from the holding of the Court.