# WILLIAM J. GARLAND *vs.* STATE OF MARYLAND.

*Conspiracy to Obstruct Administration of Justice—Sufficiency of Indictment—Evidence.*

The common law offense of conspiracy consists of an unlawful combination and agreement. The agreement may be to commit a crime or to do a lawful act by criminal or unlawful means, but in neither case is an overt act necessary to the completion of the offense. When the object of the combination is to commit a crime or do an unlawful act, the means by which it is to be accomplished are immaterial, the offense being the unlawful agreement to do an unlawful thing.

In an indictment charging the common law offense, the means by which the object is to be accomplished need not be stated, and in stating the object of the conspiracy, it is not necessary to set out the offense with the accuracy or detail which would be required in an indictment for that offense.

This rule does not apply to conspiracies to do a lawful act by unlawful means, but in such case it must appear by the indictment that the means to be employed are unlawful.

To obstruct the due administration of justice is an indictable offense at common law, and Code, Art. 27, sec. 28, provides for the punishment of every person who shall corruptly obstruct or impede, or endeavor to obstruct or impede, the due administration of justice in any Court of this State.

An indictment charging a conspiracy unlawfully and corruptly to obstruct due administration of justice in a certain named case, in a certain named Court, is sufficient, since it states the object of the conspiracy and informs the accused of the crime with which he is charged.

An indictment may contain several counts charging the same offense in different language, so that they apparently charge different offenses.

It is within the discretion of the trial Court to refuse to allow a question to a witness, which he has once clearly answered, to be repeated over and over again.

The defendant was indicted for a conspiracy to obstruct the due administration of justice in a certain Court, and the evidence showed that he agreed to endeavor to induce a Grand Jury to dismiss a charge against a certain person for the unlawful sale of liquor. A witness who testified that he paid the defendant a sum of money may also testify that he paid it because he presumed that the case had been dismissed by the Grand Jury through the exercise of defendant's influence.

The evidence in this case examined and held to be admissible to prove a conspiracy between the defendant and others to obstruct the administration of justice, and that this evidence was corroborated by proof of the admissions and statements of the defendant.

In a criminal case, the Court cannot be required to instruct the jury as to the legal effect or sufficiency of the evidence, since in such a case the jury are judges of the law.

*Decided January 11th, 1910.*

Appeal from the Criminal Court of Baltimore (GORTER, J.).

The cause was argued before BOYD, C. J.. BRISCOE, PEARCE, SCHMUCKER, BURKE and THOMAS, JJ.

*Thomas G. Hayes,* for the appellant.

*Albert S. J. Owens, State's Attorney for Baltimore City,* and *Eugene O'Dunne, Deputy State's Attorney* (with whom was *Isaac Lobe Straus, Attorney-General,* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

The appellant was indicted in the Criminal Court of Baltimore City for unlawfully conspiring with one W. Wallace Elliott and a certain other person to the grand jurors unknown to unlawfully obstruct the due administration of justice in said Court.

The defendant demurred to the indictment and to each count thereof; the demurrer was overruled and the trial resulted in a verdict of guilty.

During the trial nine exceptions were reserved by the defendant; the first seven to the refusal of the Court to allow certain questions to be asked and answered in the cross-examination of a witness for the State; the eighth to the refusal of the Court to strike out the answer of the witness, and the ninth to the overruling of a motion by the defendant, at the conclusion of the State's testimony, to strike out all of the evidence produced by the State, "or any part thereof, which may be inadmissible."

After the verdict the defendant filed motions for a new trial and in arrest of judgment. These motions were overruled by the Supreme Bench of Baltimore City, and the defendant was sentenced to pay a fine of $200 and costs, from which judgment he has appealed.

1. The indictment contains sixteen counts. The demurrer to the first, second, seventh and eighth counts was not pressed in this Court, but it is insisted that the other counts are defective because they fail to give to the defendant any definite or certain information of the crime with which he is charged; and because they "are vague and uncertain, and in each of them the object of the conspiracy is set out as a conclusion of law."

The first and seventh counts charge as the object of the conspiracy "unlawfully and corruptly to endeavor to influence the jurors of the Grand Jury aforesaid of the September term of the said Court for the said year nineteen hundred and eight, in the discharge of their duty as such jurors as aforesaid, so as to cause said charge against the said Marcyz Plasynski to be dismissed by said Grand Jury for the September term of said Court."

The second and eighth counts state that the conspiracy was "unlawfully and corruptly to endeavor to impede the jurors of the grand jury aforesaid—in the discharge of their duty

as such jurors as aforesaid, so as to cause said charge against the said Marcyz Plasynski to be dismissed," etc.

In the other counts the object of the conspiracy is charged as follows:

3rd, 9th and 13th. "Unlawfuly and corruptly to obstruct the due administration of justice in said Court in said cause therein and then pendng as aforesaid."

4th, 10th and 14th. "Unlawfully and corruptly to impede the due administration of justice in said Court in said cause therein then pending as aforesaid."

5th, 11th and 15th. "Unlawfully and corruptly to endeavor to obstruct the due administration of justice in said Court in said cause therein then pending as aforesaid."

6th, 12th and 16th. "Unlawfully and corruptly to endeavor to impede the due administration of justice in said Court in said cause therein then pending as aforesaid."

The nature of the crime with which the appellant is charged, as well as the requisites of good pleading in such cases, have been so recently and fully considered and stated by this Court, as to require and admit of but little further discussion. It is well established by the decisions in this State, and by the great weight of authority elsewhere, that the gist of the common law offense of conspiracy is the unlawful combination and agreement. The agreement may be to commit a crime or to accomplish an unlawful purpose or to do a lawful act by a criminal or unlawful means, but in neither case is an overt act necessary to the completion of the offense. Where the object of the combination is to commit a crime or to do an unlawful act, the means by which it is to be accomplished are immaterial, the offense being the *unlawful agreement* to accomplish the criminal or unlawful purpose.

In an indictment charging the common law offense, the means by which an unlawful or criminal object is to be accomplished need not be stated, and in stating the object it is only necessary for the indictment to show that the purpose of the conspiracy is criminal or unlawful. When the agreement

is to commit an offense known to the common law or created by statute,, it is not necessary, in stating the object of the conspiracy, to set out the offense with the accuracy or detail required in an indictment for that offense. The reason for the rule is that the crime of conspiracy does not consist in the accomplishment of the unlawful object, or in doing the acts by *means* of which the desired end is to be attained, but the *essence* of the offense is, as we have stated, the *unlawful combination and agreement* for *any* purpose that is unlawful or criminal. This rule does not, of course, apply to conspiracies to do a lawful act by unlawful means. In such cases it must appear by the indictment that the means to be employed are unlawful.

In *State* v. *Buchanan et al.,* 5 G. & J. 317, JUDGE BUCH-ANAN states that at common law a conspiracy to do anything that the law forbids is indictable, and that " the case of the *King* v. *Marbry and others,* 6 T. R. 619, was a conspiracy to pervert the course of justice, which is of itself an indicta-ble offense." The same learned judge, after a most careful review of the decisions in England "running through a space of more than four hundred years," says that it is clearly settled "that in a prosecution for a conspiracy, it is sufficient to state in the indictment, the conspiracy and the object of it; and that the means by which it was intended to be accomplished need not be set out, being only matters of evidence to prove the charge, and not the crime itself, and may be perfectly indifferent."

In the case of *Blum* v. *State,* 94 Md. 375, the appellants were indicted in the Criminal Court of Baltimore City "for conspiracy 'by means of divers false pretenses and repre-sentations, and other false and subtle means and devices to obtain and acquire unto themselves certain properties, mon-eys, goods and chattels' of certain corporations and persons named in the indictment, and of certain other persons to the jurors unknown, of the value of $2,500.00, and to cheat and defraud such persons and corporations." JUDGE PEARCE, after stating that a "large part of the able brief of the ap-

pellants, and of the oral argument of their distinguished senior counsel (the late Wm. Pinkney Whyte), was devoted to a criticism of the indictment, which it is contended does not set forth the offense with the clearness and certainty necessary to apprise the accused of the crime with which they stood charged," said "no demurrer having been interposed to the indictment, we would not be warranted in reviewing it here, but we deem it proper to say in order to avoid the creation of any doubt upon the question, that we regard the sufficiency of the indictment as established by the decision in *State* v. *Buchanan,*—where all the authorities are elaborately reviewed. No decisions in this State are more highly regarded than those rendered by CHIEF JUSTICE BUCHANAN, and we think his opinion in that case is sustained by the weight of authority. In 6 *Am. and Eng. Ency. of Law,* 2nd edition, note page 587, it is said that the law there laid down has been doubted in a few isolated instances, but that it has not been successfully assailed. It was denied in *State* v. *Rickey,* 9 N. J. L. 293, but this view was disapproved by CHIEF JUSTICE GREEN in *State* v. *Norton,* 23 N. J. L. 44, and by CHIEF JUSTICE BEASLEY in *State* v. *Donaldson,* 32 N. J. L. 151; the former saying that the great weight of authority, the adjudged cases no less than the most approved elementary writers, sustained the law declared in *State* v. *Buchanan,* and the same view is held by the Courts of Connecticut, Illinois, New York, Pennsylvania and North Carolina. The case of *U. S.* v. *Cruikshank,* 92 U. S. 542, is not, in our opinion, in conflict with this view, the prosecution there being under the statute of the United States known as the Enforcement Act, and the indictment failing to specify in any of the counts what right or privilege granted or secured by the Constitution or laws of the United States, the traversers had conspired to defeat."

In the very recent case of *Lanasa* v. *State,* 109 Md. 602, the object of the conspiracy charged in the third count was "to willfully and maliciously injure and destroy the property of Joseph Di Georgio," and counsel for the appellant in that

case insisted, as is contended by the distinguished counsel for the appellant in this case, that the object of the conspiracy was not sufficiently described, but this Court, in the opinion delivered by JUDGE BURKE, said: "Upon the settled law of this State and upon the authority of well reasoned cases in other jurisdictions, we cannot agree that the count assailed is in any respect defective, or that the judgment should be arrested. A conspiracy may be described in general terms, as a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose; or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means. It is not essential that the act intended to be done should be punishable by indict·ment. The *essence* of the offense consists in the *unlawful agreement* and combination of the parties, and therefore is completed whenever such combination is formed, although no act is done towards carrying the main design into effect. * * * We cannot for a moment doubt that a combination and agreement between two or more persons willfully and maliciously to injure and destroy the property of the third person is a completed criminal conspiracy, and is the subject of an indictment. Nor is it necessary to the completion of the crime that the conspirators should determine in advance what particular property should be injured or destroyed. To hold that the law cannot interpose and arrest by criminal procedure the malicious purposes of the conspirators, unless they had agreed upon the destruction of some particular property would strip it of its most beneficent preventive powers and leave the confederates at liberty to consummate their wicked purposes. The law is not so impotent and ineffective. As it is not essential to the completion of the offense that any particular property should be detroyed, it is, therefore, not required that the object of the unexecuted conspiracy should be set out with great particularity or certainty in the indictment, only such facts need be stated as shall fairly and reasonably inform the accused of the offense with which he is charged. To require more in such a case would be to put an

unnecessary burden upon the State, and make it impossible in many cases to secure the conviction of the guilty."

In the case of *Commonwealth* v. *Eastman and Others,* 1 Cushing, 224, the Court held that: "If the alleged conspiracy be an unlawful agreement of two or more persons to do a criminal act which is a well-known and recognized offense at common law, so that by reference to it as such, and describing it by the term by which it is familiarly known, the nature of the offense is clearly indicated, in such a case a charge of conspiracy to commit the offense, describing it in general terms, will be proper."

In 8 *Cyc.* 664, it is said: "In charging the intended offense, the indictment need only be certain to a common intent. The crime intended to be accomplished by the conspiracy need not be described in the indictment with the accuracy or detail which would be essential to an indictment for the commission of the offense itself, but need only be designated as it is known to the common law or defined by statute. Allegations of acts which if committed would have constituted the crime are not required; but where the intended offense has no designation at common law, or having a designation the indictment does not so refer to it, but attempts to state its ingredients, they must be stated as fully as if the indictment were for the commission of the offense itself. If the purpose of the conspiracy be the doing of an act which is not an offense at common law, but only by statute, such purpose must be set forth in such a manner as to show that it is within the terms of the statute."

It cannot be doubted that it is an indictable offense at common law to obstruct the due administration of justice, and sec. 28, Art. 27 of the Code, provides for the punishment of any person who shall corruptly "obstruct or impede, or endeavor to obstruct or impede, the due administration of justice," in any Court of the State. The indictment here is not for obstructing the due administration of justice, but for a conspiracy having for its object an unlawful and criminal purpose. If an indictment charging a conspiracy to obtain

certain properties of certain persons "by means of divers false pretenses and representations, and other false and subtle means and devices," and an indictment charging a conspiracy to "willfully and maliciously injure and destroy the property" of a certain person, without naming the property, or the means by which it was to be destroyed, sufficiently informed the accused of the crime with which they were charged, an indictment·charging a conspiracy to unlawfully and corruptly obstruct the due administration of justice in a certain case in a certain Court, is not less certain and definite.

In view of the decisions to which we have referred, and the great number of authorities cited in support of them, we cannot hold that the indictment in this case fails to sufficiently state the object of the conspiracy, or to inform the accused of the crime with which he is charged.

It is true there are many means by which the due administration of justice may be unlawfully and corruptly obstructed, resort to which would be an indictable offense, coming within the general designation; but the unlawful agreement may not have gone to the extent of determining which of these means was to be employed in the accomplishment of its object, and such determination was not essential to the completion of the conspiracy.

2. In support of the motion in arrest of judgment, it is urged that the counts in the indictment charge *apparently* the same offense, and that the indictment is, therefore, bad for duplicity. It is conceded that an indictment may contain several counts charging the same offense, but it is claimed that they should, nevertheless, *apparently* charge different offenses. Without referring to the authorities cited in support of this contention, it is only necessary to say that the several counts in the indictment in this case are not exactly alike, and we think that there is sufficient variation to obviate so technical an objection.

3. Marcyz Plaszynski kept a saloon on his premises, No. 1625 Eastern avenue, Baltimore City. On Sunday, the 13th

of December, 1908, his place was raided, and on the same day he was arrested and charged before the appellant, one of the Police Justices of Baltimore City, with selling intoxicating liquor on Sunday, and was committed for the action of the Grand Jury. This charge was pending before and was dismissed by the Grand Jury on the 15th of December, 1908. W. Wallace Elliott, the co-conspirator, was called by the State and testified that he was employed as solicitor by the George Brehm Brewing Company, and that his duties were to attend to all outside business of the company and to solicit new business; that he knew Marcyz Plaszynski, and that he was a customer of the brewery company. When asked to tell all he knew in regard to meeting Justice Garland, the appellant, on Tuesday, the 15th of December, 1908; "the circumstances surrounding it, and how it came about and what happened," he testified as follows: "I will start on the morning when I arrived at the brewery. I arrived at the brewery on that Tuesday morning—Tuesday, December 15th—at my usual hour, which is eight o'clock in the morning. The rest of the force get there a little earlier than I do. I had left the brewery office for some purpose— I don't know what—for a few minutes, and when I came back in the office I was informed that Mr. Plaszynski had been there and stated that his case would come up before the Grand Jury that day and wanted us to do what we could for him. We talked the matter over in the office, and I made the remark, I did not see what we could do for him; and Mr. Broadbelt, he replied, 'Well, why don't you see Bill Garland; perhaps he can do something?' I said, 'I don't see what he can do; he is the committing magistrate.' 'Well,' he says, 'he has friends, and you don't know what he can do.' I then said, 'Come to Mr Brehm's private office;' and I told him that it had been suggested that I see Mr. Garland; and he says, 'Well, see him.' I then proposed to call him up over the telephone, to make an appointment to meet him uptown. I called him up over the telephone, told him who I was, and asked him if he could meet me uptown

at the Equitable Cafe at about ten o'clock. He told me to
make it a quarter of ten. He said to me he had a good deal
of business to attend to; to make it a quarter of ten o'clock.
I went uptown and arrived there on time, and so did Mr.
Garland. He met me in the cafe in the Equitable Building.
I asked him to step outside into the corridor, which he did.
I then said to him, 'Judge, I called you up to have a talk
with you in regard to the Plaszynski case.' He says, 'Well,
what about it?' Says I, 'Mr. Plaszynski has been out to the
brewery; I did not see him, but he has been out there and
protesting his innocence and talking about his case, and we
really think there is not a strong case against him, and
don't see how you could have sent his case to Court.' He
said, 'Well, I thought there was something there the Grand
Jury ought to unravel, and I sent it to Court.' I then says,
'Judge, can you do anything to get this man out of trou-
ble?' He says, 'I cannot, but I can get somebody.' Says I,
'All right, I will leave the case with you and I hope that
you can do something.' He says, 'Will he pay?' I says,
'Yes, we will pay.' 'How much?' I said, 'I don't mind'—I
think I said, 'I don't mind twenty or twenty-five dollars.'
That is what I said, to the best of my memory. And he
said, 'Will you make it forty-five dollars?' And I said,
Yes.' He says, 'All right, I will see what I can do. All
right, I will see what I can do.' And he left me with a
wave of his hand. I went back into the cafe, and in a few
minutes Mr. Plaszynski came in and he said, 'My case is
before the Grand Jury.' I said, 'Yes; I am looking out
for you, Mr. Plaszynski.' I had to halloa at him; he is
very deaf and speaks English very imperfectly and under-
stands very badly. I says, 'I am looking out for it.' He
says, 'You will get me a good lawyer?' I says, 'Yes, I will.'
He says, 'You get me a good lawyer, Mr. Elliott.' I says,
'It will cost you twenty-five dollars.' He says, 'All right.'
He went away. I left and went attending to my business
around, and don't know what became of him then; and in
the afternoon—I am sure it was not earlier than half-past

twelve o'clock; it may have been 1 o'clock—I was standing
at the Equitable bar, and Mr. Garland came in. He says to
me, 'Mr. Elliott, that case has been dismissed.' 'That is all
right, Judge,' I says, 'I will give you that money tomorrow,
Judge. Will that do?' He says, 'Well, that will do, but I
would rather have it today, if you can give it to me.' I says,
'All right, I will go over to the office and get it.' I went
to the office and got the money out of the safe. I think I
got—I got it as large as I could. There was a twenty-dollar
note in it. I made it a point to get the money as large as
I could. When I left him in the cafe he went back to the
eating bar. He said, I am going back to get something to
eat.' When I returned with the money I came in through
the dining room in the rear, passing along the row of seats.
Mr. Garland was seated there, eating lunch. The bar was
filled; there was not a vacant stool in front of the bar. He
sat about in the middle in the front of the bar, and his
pocket was partially open. I put the money in his pocket—
in his right coat pocket. I said, 'Judge, I put that in your
pocket.' He said, 'All right.' I want to go along with it
as straight as I can. Now Mr. Brehm came in, and was
standing at the bar with a lot of friends; they were having
drinks together, and I wanted to speak to him on some mat-
ter of business, and I asked him into one of those small
rooms in the cafe, and we went there, sat down and began
to talk. Mr. Garland in the meantime had finished his
lunch, and came in the room and sat down and talked with
us; and we talked there for five or ten minutes possibly. Mr.
Garland went away, and I went then over in the office, in our
office in the Calvert Building; and had not been there but a
moment or two when Mr. Plaszynski came in, and he asked
me about his case; and says I, 'Your case was dismissed.'
'Oh,' he said, 'I am so glad.' I said, 'Oh, yes; your case
was dismissed.' I said, 'Have you any money with you?'
He says, 'No.' I says, 'If I come down this afternoon, can
I get that twenty-five dollars?' He said, 'Yes.' I said,
'All right; I will come down.' In the afternoon, possibly

about four or half-past four o'clock, I stopped in at Plaszynski's place. He was not in. I asked his wife, and she said, 'He is not in.' I told her I had come down to collect twenty-five dollars from him; that the case had been dismissed, and she said she was very glad to hear it; said they had been in business for fifteen years, and that was the only trouble they had had. And she said, 'If I give you that money I suppose it will be all right.' I said, 'Yes; if not I will make it all right.' She gave me the money and I left her." He then produced a ticket, which is as follows: "Baltimore, Dec. 15th, 1908. Trade gift to N. Plaszynski; contribution towards settlement of Sunday violation case; twenty dollars," and signed "W. W. Elliott;" and said that he made out the ticket and dated it the 15th of December—the day the transaction took place, and the next morning, on the 16th, he handed that ticket in and got twenty dollars from the brewery; that "trade gift" is just a term that is used "for money that we furnish a party for any purpose. We might give him some-money to have his bar repaired. That would be a trade gift. It is a gift in the course of trade between the brewery and that individual. That is all it is. * * * It was practically a gift to Mr. Plaszynski."

On cross-examination this witness was asked the following question:

"Mr. Elliott, in your dealings with Mr. Garland as to the services he was to render in the matter of the pending case of Plaszynski before the Grand Jury for selling liquor on Sunday at 1625 Eastern avenue, to which you have referred in your examination in chief, I ask you this: Did you ever, in your dealings with Mr. Garland as to this matter, request him, or did you ever unlawfully and corruptly conspire, confederate or agree with Mr. Garland and another person unknown, to obstruct, impede, or endeavor to obstruct and impede or influence any juror or jurors of the Grand Jury that had the case of Plaszynski under consideration?" The State objected to the question, and the Court refused to allow it to be answered.

The witness was then asked the following question: "In your dealings with William J. Garland, the defendant, in reference to the case of Nosecyz Plasynski, pending before the Grand Jury of the State of Maryland, in and for the City of Baltimore, on December 15th, 1908, did you agree, either directly or indirectly, with Mr. William J. Garland, or with William J. Garland and another person unknown, to obstruct or impede, or endeavor to obstruct or impede or influence the said Grand Jury, or any member of it, and have it dismiss the said case of Plaszynski, which was pending before it?" to which he replied: "Well, Mr. Hayes, I have given you all the conversation I had with Mr. Garland in reference to the matter." "Q. I am entitled to have you answer the question categorically—yes or no?" and the question having been repeated, the witness replied, "I did not." Witness was then asked the following question: "Now, let me put substantially the same question—the same, except with a modification as to the administration of justice. In your dealings with William J. Garland, the defendant, in reference to the case of Nosecyz Plaszynski, pending before the Grand Jury of the State of Maryland in and for the City of Baltimore, on December 15, 1908, did you agree, either directly or indirectly, with William J. Garland or with William J. Garland and another person unknown, to obstruct or impede, or endeavor to obstruct or impede, the due administration of justice in the case of Nosecyz Plaszynski, then pending before the Grand Jury?" to which he replied, "I did not make any arrangement with him." But counsel insisted that he answer yes or no, and witness then answered, "No, sir." The witness was then asked on cross-examination six other questions which, in so far as they elicit from the witness a statement of fact, are the same as the second and third questions which were answered by the witness. The first, second, third, fourth, fifth, sixth and seventh exceptions are to the refusal of the Court to permit these questions to be answered. Even if we assume that these questions are free from objection, having gotten the benefit of the answers to the second and

third questions, the traverser was not prejudiced by the re-
fusal of the Court to allow the other questions to be answered,
and the propriety of allowing a question that has been clearly
answered to be repeated several times on cross-examination is
a matter resting within the discretion of the trial Court.
*Schwartze* v. *Yearly,* 31 Md. 276; 1 *Wigmore on Ev.,* p. 878.

On re-examination the witness was asked by counsel for
the State the following question: "Mr. Elliott, what did you
pay William J. Garland forty-five dollars for?" and he re-
plied, "Well, sir, Mr. Garland informed me that the case had
been dismissed by the Grand Jury, and presuming that it
had been through his influence; I paid him the money," and
the eighth exception is to the refusal of the Court to strike
out said answer.

The counsel for the appellant insists that it was error to
allow the witness to say that he presumed the case against
Plaszynski had been dismissed through the influence of the
accused, because it was the statement of the opinion of the
witness. But it was the statement by the witness of *his*
*reason* for paying the money to Mr. Garland. The acts and
intention of the conspirators are clearly admissible, and the
reason the witness paid the money to the traverser was as
pertinent as the fact that he paid it, and was admissible for
the purpose of reflecting upon the question as to whether there
had been a previous agreement to corruptly influence the
Gand Jury. Being admissible for that purpose, it cannot be
excluded because it involves a statement that the witness
presumed the case had been dismissed through the influence
of the appellant.

Harry E. Warner, a witness produced by the State, testi-
fied that he had an interview with the appellant in January,
1909, in which the appellant told him that he "received $45
from W. Wallace Elliott, solicitor for the George Brehm and
Sons Brewery, to get Plaszynski out of a liquor case if pos-
sible. He said that Mr. Elliott came to him and represented
that he was a poor, struggling saloon keeper who was trying
to make an honest living and asked him if he would not do

something to get him out of his trouble, to which Mr. Garland said he replied that he could not do anything himself, but he knew a man up town who could, and they then agreed upon a price. Mr. Garland asked him if he would pay for it and he said he would, and they agreed upon a price;" that he told him that the price agreed upon was forty-five dollars, and that "he gave this money to a third party, a man uptown, that he got none of it himself and that he had nothing to do with the distribution of it." The witness further stated that he asked the appellant "in what way he expected this $45.00 to be used, whether it would be by retaining an attorney or whether it would be in some legal way or whether there would be a distribution among the witnesses," and that he replied: "Oh, you know how these things are done," and gave witness no definite answer on that point, but said "those things are done every day, I was simply trying to help a friend out and got myself into it;" that Mr. Garland said: "That Mr. Elliott came to him and told him about this poor struggling saloon keeper and said 'can't you have it fixed up, it is in the grand jury room now,' and Mr. Garland said, 'I cannot do it myself, but I have a friend up town that can do it.'" There were a number of other witnesses who testified to statements by Mr. Garland in reference to the matter.

The defendant objected in advance to the testimony of each witness, and the record contains the following note by the stenographer: "The defendant objects to this testimony and the Court rules that it be admitted subject to exception, with the privilege to the defendant to move to strike out the whole or any part of it at the close of the State's case. This general objection to the incompetency of the evidence being limited to the objection that it is inadmissible until *prima facie* proof of the conspiracy is introduced, any other objections based on any other grounds, to be specially noted and ruled upon at the time, excepting the admissibility of uncorroborated testimony of accomplices." And at the conclusion of State's testimony the defendant filed a motion to strike out "the evidence of each of the State's witnesses in whole, or any

part thereof which may be inadmissible." The grounds of
the motion are, first, that the evidence does not prove or tend
to prove that the defendant entered into the conspiracy
charged in the several counts of the indictment; secondly,
that the evidence of W. Wallace Elliott is not corroborated,
and thirdly that the State failed to produce any testimony
tending to prove the *corpus delicti,* and that the confessions
or admissions of the defendant offered in evidence by the
State cannot therefore, "prove or tend to prove that the de-
fendant is guilty" of the conspiracy charged in the indict-
ment."

We have carefully considered the very able presentation of
the case by the learned counsel for the appellant, and have
examined the numerous authorities cited in their elaborate
briefs, but do not find in the record any grounds for a reversal
of the judgment appealed from. We cannot hold that the evi-
dence produced by the State was not admissible because it
did not *tend* to prove the commission of the offense charged
in the indictment. The evidence of W. Wallace Elliott was
corroborated by the evidence of the admissions or statements
of the appellant, and was admissible for the purpose of show-
ing the alleged conspiracy. With the sufficiency of the evi-
dence we have nothing to do. The jury in this State are the
judges of both the law and the facts, and where there is no
reversible error in the rulings of the Court, their finding
must stand. *Hiss* v. *Weik,* 78 Md. 446; *Lanasa* v. *State,
supra.*

In the case of *Bloomer* v. *State,* 48 Md. 521, the motion
was to exclude from the jury all the evidence in the case upon
which the State relied to support certain counts in the indict-
ment, and the Court held that the motion was properly over-
ruled because the jury are made the judges of law, as well
as of fact, in the trial of criminal cases, under the Constitu-
tion of the State, and that they would be at liberty to disre-
gard any instructions given by the Court. In the case of
*Beard* v. *State,* 75 Md. 275, JUDGE ALVEY said: "The judge,
therefore, cannot, by any instruction given in a criminal

case, bind the jury as to the definition of the crime, or as to the legal effect of the evidence before them.   He can only bind and conclude the jury as to what evidence shall be considered by them, he being the exclusive judge of what facts and circumstances are admissible for consideration."   In *Ridgely* v. *State,* 75 Md. 512, at the conclusion of the State's case the traversers requested the Court "to instruct the jury that the State has offered no evidence legally sufficient to support the indictment, and their verdict must be for the traversers."   And this Court said: "No Court in this State, whatever may be the rule elsewhere, can be required by counsel or jury in criminal cases to give instructions, either upon the law of the crime or on the legal effect of the evidence."   In the late case of *Dick* v. *State,* 107 Md. 17, Judge Pearce says that "the motion to strike out the testimony of the State was in legal effect a demurrer to the evidence and an attempt to obtain an instruction from the Court to the jury to render a verdict for the defendant, and it is well settled that this cannot be done in Maryland, where the jury in criminal cases are the judges of the law, and the legal effect and legal sufficiency of the evidence, and the Court only determines the admissibility of the evidence."   There were no exceptions to the rulings of the Court admitting the evidence produced by the State, but it was objected to, and was admitted subject to the right of the defendant to move to strike it out, on the ground that it was not admissible until *prima facie* evidence of the conspiracy had been produced, and to strike out the evidence of the accomplice, Elliott, on the ground that it was not corroborated.   The order in which the evidence should be produced in such cases is a matter largely within the discretion of the Court (8 *Cyc.* 683; 3 *Greenleaf on Ev.,* 100, 16 ed.), and as we have said, there was evidence in the testimony of Elliott admissible for the purpose of showing a conspiracy, and it was corroborated by the evidence of the admissions and statements of the accused.

It is stated in 3 *Greenleaf on Ev.,* 101 (16 ed.), that, "The *evidence* in proof of a conspiracy will generally, from the nature of the case, be *circumstantial.* Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed in terms to have that design, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, the jury will be justified in the conclusion, that they were engaged in a conspiracy to effect that object."

Finding no error in the rulings of the Court below we must affirm its judgment.

*Judgment affirmed.*