The appealing defendant, Fred E. Dale, alias Jimmy Dale, Mrs. Fred E. Dale, alias Rene Duffy, and Dr. W. E. Wishart, were tried at the July Term, 1940, of Mecklenburg Superior Court, upon a bill of indictment reading as follows:
"The Jurors for the State upon Their Oath Present, That: Fred E. Dale,alias Jimmy Dale, Mrs. Fred E. Dale, alias Rene Duffy, and Dr. W. E. Wishart, late of the County of Mecklenburg, on the 1st day of April, 1938, with force and arms, at and in the County aforesaid unlawfully, willfully and feloniously, conspired, confederated and agreed together to knowingly, devisingly, and intending to cheat and defraud Rufus Bryant of his goods, moneys, chattels and property, and in furtherance of such unlawful, willful and felonious conspiracy, did then and there unlawfully, willfully and feloniously, knowingly, devising and intending to cheat and defraud Rufus Bryant of his goods, chattels and property, did then and there unlawfully, willfully and feloniously and designedly falsely pretend to Rufus Bryant, knowingly, that Mrs. Fred E. Dale, alias Rene Duffy, was pregnant and was going to become a mother of a baby and that Rufus Bryant was the father of the child with which she was pregnant and of which she was to become a mother; whereas, in truth and fact the said Mrs. Fred E. Dale, alias Rene Duffy, was not pregnant and that Rufus Bryant was not the father of the child of which she claimed to be pregnant, and that she was not to become the mother of a baby, as they, the said Fred E. Dale, alias Jimmy Dale, Mrs. Fred E. Dale, alias Rene Duffy, and Dr. W. E. Wishart, then and there well knew to be false, by color and means of which said false pretense and pretenses they, the said Fred E. Dale, alias Jimmy Dale, Mrs. Fred E. Dale,alias Rene Duffy, and Dr. W. E. Wishart did then and there unlawfully, willfully, feloniously, knowingly and designedly obtain from the said Rufus Bryant, the sum of $2,000.00 in money, being then and there the property of the said Rufus Bryant, with intent to cheat and defraud the said Rufus Bryant and did cheat and defraud the said Rufus Bryant to the great damage of the said Rufus Bryant, contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State."
Before pleading to the bill of indictment the defendant, through his counsel, moved to quash the bill of indictment, filing a written motion as follows:
"The defendants, and each of them, move the court, in apt time, to quash the indictment in this action, for that upon its face it is void as a matter of law, in that: *Page 628 
"1. It charges a crime under the common law, that is classified under the common law as a misdemeanor, and the indictment was found and returned by the grand jury more than two years after the alleged commission thereof, contrary to the statute.
"2. It alleges the consummation of the alleged conspiracy and the commission of a statutory crime, and the alleged conspiracy merges as a matter of law into the statutory crime.
"Wherefore, defendants pray that the indictment be declared void and quashed.
"This July 16, 1940."
Subsequently, a "Supplement or Addition to Motion to Quash" was filed, as follows:
"The defendants, and each of them, by way of supplement or addition to motion to quash of July 16, 1940, allege:
"3. That the count in the bill of indictment charges two separate, independent and distinct offenses, in that the first part of the count charges a conspiracy to defraud one Bryant, and the latter part of the count charges the crime of cheating and defrauding the said Bryant, and the said count is fatally defective for duplicity, and in the event that the State fails to elect the crime upon which it is proceeding against the defendants, the defendants are entitled to have the bill of indictment quashed."
These motions in all of their aspects were denied and the defendant excepted.
The defendant then moved, ore tenus, to quash the bill of indictment upon the ground that on its face it does not allege any criminal offense. This motion was also denied and defendant again excepted.
Thereupon the defendant moved that the court require the solicitor to elect whether he would proceed on the apparent alleged conspiracy or on the apparent alleged obtaining of money under false pretense. The motion was denied and defendant excepted.
The trial proceeded, and the evidence and its inferences taken in the light most favorable to the State, stated in narrative form and summarized, may be presented as follows:
Betty Austin, a witness for the State, testified that she had begun to date men in hotels for hire in Richmond, Va., and that she continued that practice for several weeks there, then came to Raleigh, North Carolina, for the same purpose, in May, 1938, and soon thereafter filled a date with Jimmy Dale. She went with Dale from Raleigh to Charlotte and then out to his home, 1548 Duckworth Avenue, and met his wife, whose nickname in the home was "Sunny" Dale, and a girl there known as "Boots." She remained in the Dale home about a week, during which time she filled dates with men in hotels and apartments, where *Page 629 
she was carried by Jimmy Dale. After an absence from Charlotte of two or three months, she returned some time during the month of August. At that time Jimmy, Sunny, Boots, and a maid were at the Duckworth Avenue house. After witness had been there a couple of days the three of them, that is, Jimmy, Sunny, and the witness, were sitting together in the living room and witness asked Sunny Dale why she was gaining in weight and the reply was that she was going to have a baby. When witness told her that she was under the impression that she could not have children and that she had told her that when she was there before, Sunny Dale told her she was not really going to have a child; that she had had an operation performed to keep her from giving birth to children; that the operation had been performed by Dr. Wishart. "She said she wasn't going to have it herself, but there was an unmarried girl that was going to have a child, and that they were going to take the baby." Sunny Dale said "that she was going to say that it belonged to this old farmer (meaning Rufus Bryant), and the old farmer thought that she was going to have this child." "She didn't tell me the name of the farmer except that his name was Rufus. Both she and Dale talked about it any time during the day or the evening — about how they were to have this baby and how they were going to get it. I asked her how in the world she was going to tell this farmer she was going to have a baby if she couldn't, and if she wasn't going to see him any more before the child was born, and she naturally was inclined to be stout and she really gained. She looked like she could have been pregnant and she said that she was going to tell the farmer that the child was an eight-months baby. I was there about three weeks then, and I was there when the child was born."
Witness further testified that before the baby was born Sunny Dale, Jimmy and the witness went up to Charlotte to get a crib from some second-hand furniture dealer there. Dale left them parked in the street and went to see about the baby bed, and while they were there on the street Dr. Wishart came by and spoke to them. Sunny Dale asked Dr. Wishart "when the child was going to be born and he said he was expecting it at any time; that the had examined the mother of the child, and was expecting the child to be born any time. He asked her what she she expected to do with it if the old farmer didn't take care of it, and she said she would leave it on some rich man's doorstep if she couldn't take care of it. Dale was not at the car when this was said."
Before the birth of the child the witness asked Sunny how she was going to have this child in the hospital, and supposing this farmer came to see her. She said the girl was going in the hospital under the name of Rene Duffy, and that was how the child was going to be born, and if he came to the hospital he wasn't going to be allowed to see her. *Page 630 
Dale and his wife had an ornamental deer on the mantelpiece on Duckworth Avenue. "Sunny called the deer `Rufus,' and Mr. Dale said, `Don't call my deer anything like that.'"
After the mother of the child went to the hospital the birth of the child was announced in the paper under the name of Mrs. Eugene Duffy. Sunny said the name was wrong and called the paper and tried to correct the name, and it came out again as Gene Duffy, when it was supposed to be Rene Duffy.
During her second stay in Charlotte the witness continued to go to hotels, Dale taking her there. He also took Boots when she was there and Sunny when she was well. She had a short sick spell from overeating. Also she had gotten both of her eyes blacked from going out on a date with a couple of fellows who were drinking. After the baby was born she began dieting and was really sick in bed for three days.
"Sunny" talked to witness about Rufus Bryant quite a bit, calling him "the old farmer," and when the child was born Bryant, sent her some money. Jimmy also talked about it — how she met this farmer in a hotel, and the first time she met him he had given her $90.00 and at another time had given her $600.00 and they had bought the home on Duckworth Avenue and a Terraplane automobile. Witness said that "Sunny" told her the first time she met him in the hotel he asked her why she was doing this way and she told him her mother was ill and she needed the money for her mother; that he believed her and told her he would help her and gave her $90.00 then, and she stayed with him a while and went back to her and Jimmy's room and then came back and spent the rest of the night with him. At different times Mrs. Dale told the witness, in the presence of Jimmy Dale, about going to see Bryant near Wilson.
Witness was in a hotel the night the baby was born and Jimmy Dale came for her, told her the baby was born and that it was a boy. When witness went home Dale took her straight out to their house and Sunny asked her how much money she had. Witness told her and Sunny said: "Look what I've done, and I haven't even been out of the house," and she showed witness a $50.00 bill. Witness picked it up and Jimmy took it and put it in his pocket. Mrs Dale said she had gotten this $50.00 from Rufus.
On witness' second stay in Charlotte Jimmy Dale wanted her to go down to the tobacco section and get connected up with some old farmer, and wanted her to buy the vacant lot next to him, if she could get connected up with someone like that, so that whether or not she made any money at home she would still have money coming in all the time. "He said if I could get hold of an old farmer like Sunny had, I would be all right." *Page 631 
Before the baby was born, Mrs. Dale and Jimmy Dale talked over the whole matter of how the baby was to be obtained from the hospital. "When we were sitting there doing nothing we would usually all of us be together, and they both talked about it. I asked them how they were going to get the baby from the hospital. They said that Dr. Wishart was going to help them get the baby." Witness was at the Mayfair Hotel the night they went after the baby and when they brought it back Mrs. Dale called witness up to her room. "The bellboys always told them what room we went to and they always knew where to keep in contact with us." Mrs. Dale wanted witness to come home. "I was supposed to spend the night in the Mayfair Hotel, and so she kept on calling, and I wouldn't go home and Jimmy come after me. So when Jimmy came after me I went home and the baby was there, and the next day I asked her how they got the baby out of the hospital, and she said that she and Jimmy stayed on the elevator and waited and that Dr. Wishart brought the baby and told the officials in the hospital that the baby was going home with some relatives and that the mother was going home with some of the rest of her relatives."
Witness saw letters addressed to Rene Duffy, which Mrs. Dale said were from Rufus. Both Dale and Mrs. Dale read the letters.
After a short absence from Charlotte, witness returned and went out to the home of "Sunny," after having been advised that the latter was alone with the maid and the baby. After drinking a lot of beer, witness did not remember anything until she woke up screaming, with both of her arms cut. She said Sunny and the maid held her and tried to give her some kind of a capsule. She and Sunny and the maid had a struggle and they finally turned her loose and Sunny told her to go to the hotel and act as if nothing had happened, and that Dale would come and get her in the morning. Instead of going to the hotel, witness went to the police station, where she stayed three days. There she talked to Chief of Police West, to some men in the F. B. I., and to Mrs. Patterson and Mr. Littlejohn. There witness made and signed an affidavit which was put in the evidence in corroboration of this witness' testimony.
While witness was at the police station, and after she had made the affidavits, Mr. H. L. Strickland, an attorney, came to see her. One of her arms had become infected and Dr. Ray came to see her and told her she would have to go to the hospital to get her temperature down. Strickland took her but did not take her direct to the hospital, but, on the contrary, to his office in the Law Building, where Dr. Wishart and Sunny were. In their presence, Strickland proceeded to talk to her about the statement she had made, told her that it wasn't any good, and that she could say she was intoxicated when she was arrested and had signed the statement and there would be nothing done about it. That *Page 632 
there was nothing to it, and witness told him she was not going to sign anything then. She remained in Strickland's office about thirty-five or forty-five minutes. Strickland then took her to the hospital, where she remained two days. While at the hospital Mr. Strickland gave her a dollar with which to buy cigarettes, coming to see her twice each day and trying to get her to sign a statement, which witness refused.
Witness borrowed money on her watch to buy a bus ticket to her home near Evansville, Ind. Witness testified that when she got to the bus station "Lawyer Strickland walked up with some papers in his hand and some money and he wanted to know why I didn't wait at the hospital till he came by for me to take me to the bus. . . he had some papers in his hand and he said if I would sign these papers he would pay my way home and make it worth my while if I would sign these papers so that there would be nothing come up about this case any more, and if I did that it would be taken care of, and I said, `No, man, I'm in a hurry, my bus is waiting for me and I'm going to catch the bus.'" Witness then went down to board the bus, and as she stepped on the bus he gave her a piece of paper and said, "Well, I'll give you my address and you keep in touch with me." The address was "Henry L. Strickland, Attorney at Law, American Trust Company, Charlotte, North Carolina."
Later witness met Jimmy Dale in Florence, South Carolina, went into a drugstore and had a Coca-Cola. Dale asked her how she got hurt. She told him that she did not remember; that all she knew was that when she woke up her arms were cut. Dale replied: "Well, you cost me about $5,000.00," and "if I go down for something I'm going to get you before I go."
On cross-examination by H. L. Strickland, attorney for Dale, this witness admitted that in April, 1939, she came to Charlotte to redeem a ring which had been pledged to Captain West for a loan; that she had gone to the office of H. L. Strickland, who assisted her in the return of the ring, and while in Strickland's office she signed an instrument, at the request of H. L. Strickland, which was the same document that Strickland had tried to get her to sign in his office, at the hospital, and at the bus station. The document is as follows:
"TO WHOM IT MAY CONCERN:
"This is to certify that last Sunday morning, November 13, 1938, I was arrested by a member of the City Police Force, and was locked up in the City Jail and confined there until late Wednesday afternoon, November 16, 1938. When I entered the jail, my arms were cut and bleeding, and I so advised the Chief of Detectives, Mr. Frank Littlejohn, and a lady by the name of Mrs. Patterson, who was a policewoman. *Page 633 
Notwithstanding this fact, they locked me in the jail without signing any warrant or charging me with any offense, and from time to time they took me out of jail and carried me to their office and quizzed me about matters pertaining to myself and also to other people of the City of Charlotte. I was not responsible for what I told the Police Department, because I had been drinking and my mind was not working clearly, and I was promised that I would be let out of jail if I made certain statements and charges against other people, and I wanted to get out of jail. I do not recall the statements I made, but I do know that my mind was not clear, and that any statement that I made, I was not responsible for. I might have made statements which were not correct, for the reason that I wanted to get out of jail.
"The purpose of this statement is to repudiate any statement that I have heretofore made to any City Policeman, Mr. Littlejohn or Mrs. Patterson or anyone else while I was under arrest at the Police Station, for the reason that I was not responsible, as I have hereinbefore stated, for anything that I might have said.
BETTY AUSTIN.
"Witness: HIRAM P. WHITACRE.
"I hereby employ H. L. Strickland, Atty. to handle the above case.
BETTY AUSTIN."
Rufus Bryant testified that he was forty-two years old and was living near Clinton, Sampson County, North Carolina; that he was a general farmer, raising tobacco. In the fall of 1937 he carried a load of tobacco to the market at Durham, North Carolina, where for many years he had sold the majority of his crop. He spent the night at a Durham hotel. He asked the bellboy if he could get him a woman that night, and, in response to that request, Rene Duffy came to his room, and he "had a date with her that night." He told the Duffy woman that he was a married man and had children and that he was not "a man of that type, and that was the first time I had ever done a trick like that, which it was." He asked her a lot of questions about her life and she told him she was a poor girl and that she had hard luck, that her husband, was dead and she had no way of getting money and was broke. "Finally I told her that if she'd quit that business and try to live a clean straight life, that I was not a rich man at all — I was a poor man and a hard working man — that I could help her some; that I didn't approve of such a life as that, that I was a clean man, that I always had been up until then, so I finally gave her some money that night." Witness next saw the woman about three weeks afterwards in Durham, when he again came to the tobacco market, and thereafter a few times during February or March, 1938, continuing his illicit relations with *Page 634 
her. On these occasions he gave her money — $10.00, $15.00, $20.00 at a time, sometimes $5.00.
The witness stated that later Rene Duffy told him she was pregnant and that he was the father of the child. From her looks witness thought it was true. She showed to be that way from then on until the birth of the child. "After she told me she was in that condition and I was responsible for it, I gave her some additional money." The first amount was for a house in Charlotte — any reasonable amount. The Duffy woman told witness that she would like for him to look out "to prepare a place for her and the child to live, that there was nobody but just her and the child." He gave her money at that time for the purchase of a house, something like $600.00 for a down payment and afterwards a monthly payment of $40.00 a month, which Rene Duffy told witness were payments on the house at 1548 Duckworth Avenue, where she was then living. (The court sustained Dale's objection to the testimony in the above paragraph as applied to him.) Later, Dale and Mrs. Dale conveyed the property to Bryant. Witness had never known Dale until just before he got the deed to the property.
This transaction was in consequence of a call from Dale to a law office in Clinton that Bryant should meet Dale and wife between Rockingham and Clinton, or close to Rockingham. Bryant and his wife met Dale and his wife at the point indicated. Rene Duffy had been arrested at some time in Clinton. Dale had formerly mentioned himself as being Rene's brother-in-law. The case was pending against Rene at the time of this meeting.
The witness stated: "I guess she had been arrested down there because she had been laying up with me." "We met over at Rockingham." At that place the property was conveyed to Bryant and his wife.
The witness stated that he had given the woman other money besides the $600.00 and $40.00 a month mentioned. "I gave her money for the support of herself and the child. I wouldn't say that the list I have of the amounts I gave her from time to time is correct — but I have some idea about what I gave her." In all, the witness stated that he had paid Rene Duffy over $2,000.00.
In addition to this he had paid for Rene Duffy $100.00 hospital bills for some person that had been injured in a wreck by her car and $600.00 for damage to the cars.
At that time Rene Duffy told him that she had been taken down to police headquarters and that some letters Bryant had written her had been gotten hold of. That she had to get some money to have it settled. Bryant at that time gave her over a hundred dollars.
After he learned of her alleged pregnancy he gave her money to make payments on furniture — from time to time something in the neighborhood *Page 635 
of $400.00. In addition to this he gave her money for board before she purchased the house — some three or four months, at about $7.00 a week. This was before the child was born.
After notifying Bryant that the baby was born, Rene Duffy, or Mrs. Dale, applied to him for money from time to time. Bryant sent her money to pay her hospital bill, under the impression that she was in the hospital in connection with her pregnancy. He sent her money also because the baby was sick. During all this time he did not know that she was not pregnant and was not the mother of the child, nor that she could not have a baby. He gave her the money for herself and the baby. At the time he thought that there would probably be a baby and he didn't think it was anybody else's. He had been told that they thought the child would come before the nine months period. Rene Duffy told him that she had been examined by Dr. Wishart and was advised to that effect.
Witness saw the woman and the baby a number of times before he came to Charlotte, coming to Charlotte once or twice thereafter but not staying any length of time.
Witness identified a number of letters written by him to Rene Duffy, which were later introduced in evidence.
On cross-examination this witness admitted that he had, at the instance of Rene Duffy, signed a statement that he had given her money of his own free will, and that he had known all along that the child was not his, and that she had not extorted money from him; that he just wrote what Rene Duffy worded for him. There were other contradictions in the cross-examination.
Of the letters identified by Bryant and introduced as bearing upon the deception alleged to have been practiced upon him, the following excerpts are pertinent and are reproduced here solely under that necessity:
"Friday A.M.
"My Dearest Mother:
"I will write you a short note this A. M. Honey, how are you both getting along since I saw you? Surely do hope you all are well of those terrible colds.
"Honey, I cannot express to you my feelings of seeing you and the little one. Dear, you just don't know my heart and how I am worrying because all the pleasure of being with you both I am losing all of it. Honey, rite now is always the sweetest time of a little one's life, because they are never but once a child. Oh and how I always loved the little ones so much. Darling ours always would go to me in preference to anyone else. *Page 636 
"Honey you never had had this experience before but my dear you soon understand why I miss Little Howard so much. Oh Dear he was such a sweet child always smiling and a word for ever body just to fit so pleasant. Honey as you (missing word) and (missing word) get to be a little size then you know what a child's love really means. You see my Dear just as it is with me I only can think of him as I know how ever thing is. No matter how bad I want a sweet little kiss at night I can't get it for you both are to far away to reach so easy. And to my Dear it will be all I can do to keep both of you now in good Health and provide for you with all my other expense. Honey these cheep prices are about to worry me to death for it now looks like to me that it take every penny of my crop to meet debts that are due now. And my Dear its another lonely year ahead before pay day again. But my Dear I strive on land on as long as I have breath to do with for love is all I live for my dear and that Great Home in life to come. Darling I do hope that you can realize and know how my love is so great for you. And want you to let you love be so great for me that I can just feel it ring through my Heart even if you are miles away from me. Well my Dear I am in Wilson today and it pouring Rain and I guess will be in Durham first of week. Listen my Dear I will send you a wire first what to do when I get there so you be on watch for it and Dear you need not wire me unless I say so first notice what the wire is.
"Honey I don't hardly feel like I have seen you both the time was so short. Honey I can see those little long strecher and little smiles as I think of seeing the little one. Such a sweet little thing as he is so happy to live for isn't it. Well Honey I only had a few minutes so I must close with all my love and Kisses are yours and little C. H. Look to hear from me first of next week. Bye. Your
Fore ever and ever,"
"My dearest one,
". . . My dear I thought of you just as I told you and I was thinking so earnestly about you both that you would get Home safe and alrite. My Dear I have thought so much of you both since I had to leave you.
". . . Honey after our pleasure it is so hard to have to separate so far apart and Honey the said part of it is that I am missing all of the little ones pleasure rite when he is so sweet. Honey you may think you understand but you don't. You are with him ever minute and hour and suppose you were as I am just see you both for one night and a part of a day then you have to leave you untill I can get away again. Surely My Dear it is awfull isn't it. My Darling I always thought I love you all I could but oh it is much different now and ever day I think of each *Page 637 
one of you I love both of you more and more. . . . Well bee real sweet and take good care of each one of you both untill I can see you all again. (Missing word) I see little one kicking his little feet and calling for his meals. Kisses to both of you and great big one to you.
 As ever and always, Good Bye."
J. Dan Stallings testified for the State that he had been operating a private detective agency in Charlotte and was employed by Dr. William E. Wishart to make a trip to Albemarle to contact a girl and her mother and "ask them not to make any statement to Chief Littlejohn." Witness could not make the trip at that time and later was told by Dr. Wishart to "just forget it." In the spring of 1939 he saw the Betty Austin affidavits in Chief Littlejohn's office. Witness thought they were the same affidavits now shown in court. Witness had a conversation with Dr. Wishart with respect to the affidavits and told him what they were about. At the request of Wishart he got copies of the affidavits and showed them to Wishart. He read them and asked him to tear them up or destroy them, which witness declined to do until paid for his services. He did, however, let Dr. Wishart have the affidavits to show to the Dales and, upon his return to the office, told him the affidavits were worth about a couple of hundred dollars. Wishart told him that he could not raise the money that night but that "if I would leave them there or tear them up and give him a couple of days, why they'd take care of it." Witness told Dr. Wishart he could not leave them under those conditions. He took them back to the police station and gave them to Littlejohn. Witness stated he was employed by Dr. Wishart, who was the pay-off man for himself, Keith Beatty and others, to investigate Littlejohn, but he found nothing against him.
Mrs. A. R. Manson, witness for the State, testified that she knew Essie Jake Melton, who lived at Albemarle. She was an unmarried girl but had become pregnant. The witness brought her to her home in Charlotte, where she stayed until the time she went to the hospital. Dr. Wishart attended her, having agreed to take her as a patient. The witness took her to Dr. Wishart's office several times. He came to see her several times before the baby was born and once afterward. In the Charlotte home and in the hospital she was known as Anna Carpenter. Witness took her to the maternity ward in the hospital, where the child was born. Dr. Wishart charged $250.00 for his services, which was paid him after the birth of the child. Witness had referred Dr. Wishart to a Mrs. Blackwelder, who was the grandmother of Essie Jake Melton, for instructions as to its disposition. The baby was never brought back to the home of the witness. She testified that Dr. Wishart told her he *Page 638 
could place the baby but it would cost a little something. Finally he asked if it would be all right if he placed it in a good local home, and witness replied that it would be all right if the home was good and A-1.
There was much evidence for the defense in contradiction of that of the State. It is not, however, pertinent for consideration on motion to nonsuit.
The defendant renewed his motion to require the State to elect on which offense it sought conviction and the motion was overruled. Defendant excepted.
There are numerous exceptions to the instruction given to the jury and exceptions to the refusal to give certain instructions.
The jury found for their verdict, guilty as to Fred E. Dale, alias Jimmy Dale, and Mrs. Fred E. Dale, alias Rene Duffy, and not guilty as to Dr. W. E. Wishart. Both of the convicted defendants appealed but Mrs. Fred E. Dale did not perfect her appeal or prosecute it in this Court. Only the appeal of Fred E. Dale, alias Jimmy Dale, is before the Court.
We first take up the motion to quash the bill of indictment, or to compel the State to elect upon which one of the crimes supposedly charged therein it would seek conviction.
The first objection to the indictment upon the score that it charges a misdemeanor, and prosecution on that charge is barred by the statute of limitations, has been withdrawn in deference to S. v. Ritter, 199 N.C. 116,154 S.E. 62, in which the Court holds conspiracy to be a felony. See, also, S. v. Lea, 203 N.C. 13, 164 S.E. 737.
The second ground — that the alleged conspiracy merges, as a matter of law, into the statutory offense charged as its consummation, that is, obtaining money under the false pretense — is not tenable, at least in this State. S. v. Lea, supra. The suggested doctrine of merger, if it obtains here at all, has never, as far as we are aware, been held applicable to a case of this kind. "The rule appears to be well settled in most jurisdictions that the conspiracy to commit a crime is not merged in the commission of the completed offense, but is a distinct offense of itself and is punished as such, notwithstanding its object, the admitted crime has been accomplished; and this seems to be now generally true, regardless of whether the conspiracy or its object be regarded as the same grade of offense, or one be regarded as higher than the other — as one a felony and one a misdemeanor." Sneed v. United States, 298 Fed., 911, *Page 639 
and authorities cited therein. See also, 37 A.L.R., 772, and note; Reg.v. Button, 11 Q. B., 929 (Lord Dunham); Wharton Criminal Law, 11th Ed., 1605. The distinction was never based on sound reasoning and has practically disappeared from the American practice. Heke v. United States,227 U.S. 131, 57 L.Ed., 450; United States v. Rogers, 226 Fed., 512.
The third ground advanced for quashing the bill of indictment challenges it upon the ground that two distinct crimes are charged in one count, and is, therefore, duplicitous and subject to be quashed if the State does not elect upon which crime it seeks conviction.
Generally speaking, a bill of indictment which charges two offenses in the same count is bad for duplicity. But there are some exceptions to this rule arising out of the relation of the offenses in the count to each other, and to the single transaction or series of transactions which grow out of one concatenated design.
This is especially true in indictments for conspiracy. In the prosecution of this particular crime it is generally held that a count is not duplicitous because it both recites the conspiracy to commit a criminal offense (which under our law is a complete crime without any overt act), and also describes the crime which was its consummation. Especially is that true where the conspiracy relates to statutory crimes which grew out of the facts of the conspiracy and were connected with it as overt acts in its accomplishment. 5 R.C.L., 1081; United States v. Lancaster, 44 Fed., 885;Sneed v. United States, supra; S. v. Lea, supra; "In conspiracy cases the court will never be keen to hold an indictment bad for duplicity." 37 A.L.R., 772, and note; Reg. v. Button, supra; United States v. Vannatta, 278 Fed., 559; S. v. Waymire, 52 Or. 281, 97 P. 46.
Since the bill was not duplicitous, the motion presented no ground either for quashing it or for compelling the solicitor to make an election.
The defendant complains, however, that after the theory of merger was rejected the State insisted on holding him to account for both crimes described in the bill. Such grievance as he may have had lay in the latitude given to the trial after it had passed this point — in some misdirection given the jury.
The unitary character of an offense against the law consisting of a series of acts or of two or more acts which are a part of the same transaction, some of them separately denounced by law, statutory or otherwise, and subject to prosecution separately, might have been presented to the jury in prayers for special instruction; or, failing that, instructions given contrary to the principle might have been brought up by appropriate exceptions. Scanning the exceptions to the charge, we find only one which brackets any statement relating to the two-count theory of *Page 640 
the indictment, which might fairly be considered as approaching this matter. But this exception is made to rest on a different ground, and does not present this objection. The defendant's twenty-first exception is to the following instruction: "This is the general law upon the second count in the bill of indictment, gentlemen." The court is referring to that part of the indictment which related to obtaining money under false pretense. In the record this exception is grounded upon the following objection: "The defendant, Jimmy Dale, excepts to the language embraced between (e) and (f)" [just quoted], "and especially in the light of the language following, intended by the court to explain said language, in that the two counts in the bill should have been separately stated and separately submitted and the law declared on each separately with reference to the evidence, which the court should have stated bearing on each issue separately and as to each defendant separately, which the court failed to do, leaving it uncertain upon which count the jury could or would convict." This must be taken to refer specifically to the manner in which the judge stated and the law as applicable to the two offenses, upon the facts presented, and the fact that he did not present them separately to the jury in the manner suggested by the defendant in the exception, and not as referring to the original objection that the bill was duplicitious. This interpretation is put upon the exception in the statement of "questions involved" on the first page of defendant's brief: "should the court submit to the jury separate issues and separately `state the evidence and declare and explain the law arising thereon' as to each, and likewise separately `state the evidence and declare and explain the law arising thereon' on each issue as to each defendant?"
As stated, the specification made in this objection to the charge is obviously the failure of the judge to separate the offenses in his charge and instruct as to each separately with respect to each defendant, applying the law as it relates to the particular offense and the facts of evidence, and not to the fact that the court in its instructions submitted the indictment as containing two counts, under both of which defendant might be convicted.
The verdict was general and applied to the bill of indictment as a whole. It was the privilege of the defendant, when the verdict came in and before the verdict was entered or the jury was discharged, to cause inquiry to be made as to how the jurors stood upon each of the offenses upon which he was held to account. The court was not required to do so ex mero motu.
Defendant, ore tenus, demurred and moved to quash the bill of indictment for that it does not state a cause of action. This refers to the contention that the charge relating to false pretense does not show any causation between the representation alleged to have been made by defendants *Page 641 
and the obtaining of the money. The defect, if for the moment we consider it as such, would be unimportant in a charge of conspiracy, since in such a case it is unnecessary to describe the crime, which is the subject of the conspiracy, with legal and technical accuracy. Williamson v. United States,207 U.S. 425, 52 L.Ed., 278; Garland v. State, 112 Md. 83, 75 A. 631.
Nevertheless, we think the objection without merit. The principle applied by the Court in S. v. Whedbee, 152 N.C. 770, 67 S.E. 60, we do not understand to be applicable where the surrendering of the money or other thing of value is the natural and probable result of the false pretense. Certainly, a mere "lie," which of its and upon the face of the pleading offers no inducement to a man to give up his money, would not undergird the crime, but it may be seen as an important element in obtaining money under false pretense, when the latent connection is brought out. The indictment in S. v. Whedbee, supra, failed because the indictment did not bring the conduct of the victim into such relationship with the false pretense as to suggest a reasonable motivation for his act. The facts alleged in the indictment here, relating to the misrepresentation, exproprio vigore, are such as to imply causation, since they are obviously calculated to produce the result. The representation of the defendant Rene Duffy, and her co-conspirators, that she was pregnant by Bryant; that she had a child by him; takes the pretense out of the category of a mere lie, to which no response may necessarily be expected. In this respect the indictment could not be improved without writing into it some needless affirmation of the wellsprings of human conduct and social impulses commonly known since the world began.
As bearing upon the numerous motions directed to defects in the bill of indictment, we think the following excerpt from the opinion by ChiefJustice Stacy in S. v. Lea, 203 N.C. 13, 27, 164 S.E. 737, where the situation was not wholly dissimilar, is applicable: "The statute, C. S., 4623, provides against quashal for mere informality or refinement, and judgments are no longer stayed or reversed for nonessential or minor defects. C. S., 4625; S. v. Beal, 199 N.C. 278, 154 S.E. 604. The modern tendency is against technical objections which do not affect the merits of the case. S. v. Hardee, 192 N.C. 533, 135 S.E. 345; Rudd v.Casualty Co., 202 N.C. 779. If the bill or proceeding contain sufficient matter to enable the court to proceed to judgment, the motion to quash for redundancy or inartificiality in statement is addressed to the sound discretion of the court. S. v. Knotts, supra (168 N.C. 173). There was no error in refusing to quash the indictments on the grounds of duplicity and indefiniteness. S. v. Beal, supra."
The exceptions to the admission of evidence and to its application when admitted are of the usual character which we might expect to be *Page 642 
taken by prudent counsel in conspiracy cases. However, it is well understood that when a prima facie case is made out, the acts and declarations of the several defendants in the prosecution of the common purpose are admissible against each defendant. S. v. Lea, supra; S. v.Jackson, 82 N.C. 565. If orderly development of the case is to be followed at all, the admission of such evidence at any particular time must be largely a matter of discretion with the court, provided it does not violate the principle which we have just announced and go beyond it. In this case we do not find error in that respect. Here we think the court was careful to exclude such evidence as might be prejudicial to each defendant, and which did not come under the rule announced. Examining the exceptions to the evidence closely, we observe that the trial judge carefully confined the effect of the declarations of these parties as bearing upon the guilt or innocence of the persons making them.
Taking the charge as a whole, we do not find that the exceptions are sufficiently meritorious to warrant a new trial.
In the trial of the cause, we find
No error.